FILED
CLERK
1/20/2026 9:34 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
UFCW LOCAL 1500 WELFARE FUND, :
JOAN FRASER, : 25-CV-5023 (ENV)(AYS)
Plaintiff, :
V. : January 12, 2026
THE NEW YORK AND :
PRESBYTERIAN HOSPITAL, : Central Islip, NY
Defendant. :
------------------------------X
CEMENT AND CONCRETE WORKERS :
DC BENEFIT FUND, : 25-CV-5571 (JMA)(AYS)
Plaintiff, :
V. :
THE NEW YORK AND :
PRESBYTERIAN HOSPITAL, :
Defendant. :
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: DAVID ROCHELSON, ESQ.
DEBORAH ELMAN, ESQ.
Garwin Gerstein & Fisher LLP
88 Pine St, 28th Floor
New York, NY 10005

JAMIE CROOKS, ESQ.
Fairmark Partners, LLP
1001 G Street, NW, Ste. 400E
Washington, DC 20001

GERALYN TRUJILLO, ESQ.
GREGORY ASCIOLLA, ESQ.
DiCello Levitt LLP
485 Lexington Ave, Suite 1001
New York, NY 10017

For the Defendant: COLIN KASS, ESQ.
DAVID MUNKITTRICK, ESQ.
Proskauer Rose
1001 Pennsylvania Ave, Ste 600
Washington, DC 20004

Court Transcriber: ARIA SERVICES, INC.
274 Hovey Road
Milo, ME 04463
Aria@leinen.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service

MR. ROCHELSON: -- Fisher for the UFCW plaintiff.

THE COURT: Good morning.

MR. CROOKS: Good morning, your Honor. Jamie Crooks from Fairmark Partners on behalf of the Cement Workers.

THE COURT: Good morning.

MS. TRUJILLO: Good morning, your Honor. Geralyn Trujillo from DiCello Levitt on behalf of UFCW Local 1500.

MS. ELMAN: Good morning, your Honor. Deborah Elman, also from Garwin Gerstein & Fisher on behalf of UFCW.

MR. ASCIOLLA: Good morning, your Honor. Greg Asciolla, also from DiCello Levitt, on behalf of UFCW Local 1500.

THE COURT: Good morning.

MR. KASS: Good morning, your Honor. Colin Kass from Proskauer Rose on behalf of New York Presbyterian Hospital.

MR. MUNKITTRICK: David Munkittrick, also of Proskauer, on behalf of New York Presbyterian. With us is our associate, Michael Beckwith (ph). He has not filed a formal appearance on the docket yet.

THE COURT: Good morning, welcome. All

right, be seated.

This is an initial conference in these two cases. As you know, they're assigned to two different district judges right now. There's been no consolidation, and I know that's pending. It's on the docket, but that is not something that I can do. So it's pending before Judge Vitaliano and Judge Azrack, so those are their motions. I have nothing to do with that. I can't grant that. Because I can't grant that, I can't consolidate the cases. I can't do anything with respect to the filing of a consolidated amended complaint, class counsel, anything like that, or decide a motion to dismiss, which I believe the defendants want to make one. Let me hear a little bit about that.

MR. KASS: Yes, your Honor.

THE COURT: You can stay where you are. It doesn't matter. You can even sit.

MR. KASS: Great. Well, thank you. Thank you.

So this case is really about how insurance -- how hospitals negotiate contracts for healthcare insurance -- healthcare services. It negotiates with insurers. Insurers create their networks so when you go to the hospital and you need to get admitted, you have your insurance card. And your insurance card

says, okay, if you go to this hospital, you are in network and you have a lower co-pay than if you go to some other hospital that's not in your network, in that insurer's network. The insurer is the one that designs their network. They decide exactly who they want to be in the network and who they want out of the network.

THE COURT: Is the insurer the same entity in both of these cases?

MR. KASS: For these particular plaintiffs, it is the same one.

THE COURT: It's Empire.

MR. KASS: It is Empire, correct.

THE COURT: Okay, go on.

MR. KASS: They both negotiated with Empire. So what Empire will do is it says, okay, I want to negotiate the best possible rate for hospital services, how do I do that? Well, the way that I do that is, I negotiate based on volume. I am a large insurer, says Empire, I have a lot of members. I can deliver a lot of volume if I put you in network. If I put you out of network and I charge my members, Empire, I charge my members a higher co-pay, they won't go to your hospital. They will only go to the hospitals where they have a low co-pay.

So that gives the insurer a tremendous

amount of power, and they use that when they negotiate with New York Presbyterian and other hospitals. They say if you want to be in the network, you're going to have to give us a lower rate, and I will give you all of this volume. That's called steering. Nobody challenges the existence of steering. Plaintiffs say that's a good thing, steering is a good thing. We say steering is just the reality. It reflects the market power of the insurer.

But we're not challenging that. We're not the plaintiff. What we do is, when we negotiate, when New York Presbyterian negotiates with the insurer, with Empire, it says okay, you have all this volume and you want the lowest rate, put me in your highest tier. Don't discriminate against me, put me in network. So don't discriminate against me versus Mt. Sinai, versus Northwell.

THE COURT: So that's a clause in your contract with Empire.

MR. KASS: With Empire, not with the plaintiffs.

THE COURT: Is there a name for that clause?

MR. KASS: We've been referring to that as an anti-steering provision. That's not really what it is. That's not what people necessarily call it.

THE COURT: Okay, but that's a clause in a contract, and I'm going to give the plaintiffs an opportunity to talk because there are a lot of facts. By the way, I'm just asking for facts so that I can get a sense of discovery. I'm not believing anybody that they're saying what the facts are, okay, just to get a sense of what's going on here. So that's a clause in a contract between Empire and New York Presbyterian.

MR. KASS: Correct. So this is the provision that plaintiffs are challenging, but the plaintiffs do not negotiate this provision. That is Empire that negotiates this provision. Empire, they may like the provision, they may not like the provision. They like it when they're negotiating the contract because when they negotiate the contract, they say, here are all the benefits I'm going to give you in exchange for this lower rate.

Once they sign on the dotted line and they say, okay, now I've negotiated, I've given you my volume, then they start to have second thoughts. They say, actually, I've given my volume -- I've decided not to discriminate among any of the hospitals in my network. Maybe if it did discriminate, I could get lower rates by steering it elsewhere, steering it away from New York Presbyterian. If they did that -- if

they told us they were going to do that when they were negotiating the contract, then they wouldn't be delivering the same volume and they wouldn't get the same rate.

That's a decision that insurers, each individual insurer will make for themselves. Where do I -- if I'm the insurer, where do I want to steer the business? Do I want to steer it -- do I want to steer it equally among all of the -- all the hospitals in my network, or do I want to discriminate and create mini-networks or narrow networks, as they're sometimes referred to. That's a decision that Empire will make for itself.

The plaintiffs come in and they say no, Empire, you can't make that decision, NYP, you can't make that decision because they say that Empire is foreclosed from including in their contracts with NYP a provision that says they won't steer away from us. They say that these -- that Empire cannot deliver a provision that says all of this volume will go -- not to NYP as opposed to anywhere else. It's not an exclusive. They just won't discriminate against us. That's the essence of this case and that's the essence --

THE COURT: Let me give the plaintiffs an

opportunity. I'll just hear from one of you since you all think it's the same case. Pick who wants to do the talking. Talk to me about the clause or clauses that you think are anti-competitive.

MR. CROOKS: Good morning, your Honor. Jamie Crooks on behalf of the Cement Workers plaintiffs. My friend on the other side is right that the key clause that this case is about, at least that we know of now -- one thing to know at the outset is that these contracts between New York Presbyterian and the insurance companies like Empire are sealed such that the folks who pay dollars under those contracts like our plaintiffs, unions, employers, small business, et cetera, aren't able to see these contracts.

But what we've been able to glean from public reporting, including about the Department of Justice's investigation into New York Presbyterian's contracting practices, is that they include in all of their contracts with insurers like Empire a clause that's referred to as the "all products clause," which is an anti-steering clause -- we agree with that characterization of it -- that prohibits insurers like Empire from designing networks to offer to their customers, our plaintiffs, that would save money on healthcare and provide for increased choice for

employers and for ultimately patients.

So this case primarily at this juncture, in the sense that we haven't seen these contracts, but what we understand is that the all products clause is imposed on insurers over their objection in these negotiations. So we very much disagree with opposing counsel's characterization of this as a friendly bargain.

The way that this works in the negotiating room, and this is based on other cases with similar contracting clauses, some of which have been challenged by the Department of Justice for antitrust reasons, some of which by private plaintiffs sitting in the shoes that we do, the folks who ultimately pay for healthcare, is that New York Presbyterian, large hospitals like New York Presbyterian are effectively a must-have system for insurers to include in their networks. They have to include at least some of New York Presbyterian's services in their networks in order either to meet regulatory -- state regulatory requirements or just to make their plans commercially viable.

Consumers and businesses that offer insurance to their employees like choice and so yes, they do want to include New York Presbyterian in at

least some of their networks. They need to from a commercial viability standpoint. So when they sit down at a negotiating table with New York Presbyterian, New York Presbyterian says, if you want to include any of our facilities or any of our physicians, which we know you need to, you have to include all of them at the rate we set, which just so you know is about on average 75% higher than the rest of the New York market for inpatient.

If you want to include any of our facilities in your network, you have to include all of our facilities at the highest level of benefit. That is, you have to make it -- you have to make our services, no matter how costly they are, look just as attractive to patients or to employers as if someone went somewhere down the street for 50% of the price. So that clause, it's inference with insurance companies' ability to offer low cost or alternative networks is the crux of our allegations here.

THE COURT: Let me focus on something. You talked about this contract being a contract you haven't seen, right?

MR. CROOKS: That's right.

THE COURT: It's a contract between New York Presbyterian and Empire, right?

MR. CROOKS: Yes.

THE COURT: I think I saw in New York Presbyterian's letter that you haven't seen this, either?

MR. KASS: I've seen the contract between New York Presbyterian and Empire.

THE COURT: Okay.

MR. KASS: But I have not seen the contract between Empire and the plaintiffs' unions, which is actually the basis of our motion to dismiss, right, because they're indirect purchasers.

THE COURT: Between Empire and the plaintiff's union. So you need that as well.

MR. KASS: That is what we need in order to respond and for purposes just for the motion to dismiss, because we believe it's incorporated into the complaint. They're claiming that they are purchasers of the product. The only way that they could possibly be purchasers is through this contract that they have with Empire, so it's incorporated into the complaint.

THE COURT: Does the plaintiff have a problem giving that contract over?

MR. CROOKS: So we disagree that it's relevant. We certainly disagree that it's inherent in the --

THE COURT: That's what I asked you.

MR. CROOKS: Of course, right. In terms of turning it over, we have offered to exchange it as part of what this Court calls tier 1 discovery.

THE COURT: Okay.

MR. CROOKS: So what we've offered on that front is, while the motion to dismiss is being briefed, et cetera, we would offer that contract -- we'll call it a TPA contract, the contract between Empire and our clients -- if they will give us, number one, the contracts that they have between Presbyterian and Empire that has the all products clause.

THE COURT: Stop.

Will you give them that?

MR. KASS: Yeah. We offered that a long time ago.

THE COURT: Okay.

MR. CROOKS: And then number two, because we know that the Department of Justice is investigating this exact conduct and the exact same contractual provision that we're interested in -- that is the crux of our case -- documents that you've already produced to the Department of Justice under whatever protective order we negotiate.

THE COURT: That's a no, right?

MR. KASS: That's a no, correct.

THE COURT: A no for now.

MR. KASS: Yes, correct.

THE COURT: For tier 1.

MR. KASS: Correct.

MR. CROOKS: And then the only other tier 1 discovery piece is organizational charts to prepare for, you know, search term discovery, more robust discovery down the road.

THE COURT: And that's going to be part of your ESI discussions? Is that what you're saying?

MR. CROOKS: We are -- we sent defendant about a month ago a draft protective order and ESI protocol, but we've also discussed as part of tier 1 discovery exchanging organizational charts in addition to the contracts that we've just been discussing.

THE COURT: Where are you on the organizational charts?

MR. KASS: We haven't had a discussion about that. They did put that request in their joint letter. I think our view is that once discovery opens, it should open, and we can then provide organizational charts at that time. So I don't think it needs to be part of tier 1 discovery. That's not the most important thing for us. I mean, the DOJ materials and

not having to produce that is the most important thing for us at this point.

THE COURT: Right, understood. All right.

On the defense side, anything other than that contract that you have or would agree to give over to the other side? I know you don't agree with the DOJ files but anything else?

MR. KASS: No. I think that -- that we think is what we need for the motion to dismiss, and we think that's the appropriate focus at this time.

THE COURT: Okay, all right. So I looked at your, I don't know, 40-page submission, which is highly unusual and not particularly helpful in terms of doing discovery at an early phase in this case. And I know that we're still at two separate cases. We're still at the stage where plaintiffs say there's going to be a consolidated amended complaint. If there's an amended complaint, then there may be a different scope of discovery. All I can tell you about discovery now is that some of it has to go forward but not all of it, because there is going to be a motion to dismiss and it is going to be protracted.

I don't think this is a case where this is, you know, nine months and we're done. We may be done after a motion to dismiss, I don't know. But once

that's decided, then there will be a lot of work to do. So all I'm going to order at this point -- I'm not going to stay discovery. I will order that the parties give over the contracts that we talked about just earlier. I'm not going to order the DOJ file at this time, and I am hopeful that the case moves quickly for the early motion practice. And once that happens, then I think we can move forward, hopefully as quickly as possible.

I know that the plaintiffs put in a lot of information about, we're going to need more time, we're going to need more depositions, we're going to need more than the usual. I can't tell you that now because, again, you're saying there's going to be another complaint in the case, which we haven't seen yet. As far as I can see right now, we're focused on this one clause and these contracts, so that's all I'm going to order right now. And that's it really. In terms of consolidation, you're just going to have to wait for whatever judge decides on it.

I'm going to go off the record now.

* * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



ELIZABETH BARRON January 17, 2026