# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

UFCW LOCAL 1500 WELFARE FUND, on
behalf of itself and all others similarly situated,

        Plaintiff,

        v.

THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

        Defendant.

Case No. CV 25-5023

JURY TRIAL DEMANDED

-------------------------------------------------------

CEMENT AND CONCRETE WORKERS
DC BENEFIT FUND,
on its own behalf and on behalf of
others similarly situated,

        Plaintiff,

        v.

THE NEW YORK AND
PRESBYTERIAN HOSPITAL,

        Defendant.

Case No. CV 25-5571

JURY TRIAL DEMANDED

---

## CONSOLIDATED CLASS ACTION COMPLAINT

---

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| I. | NATURE OF THE ACTION | | 1 |
| II. | PARTIES | | 10 |
| | A. | Plaintiffs | 10 |
| | B. | Defendant | 11 |
| III. | JURISDICTION AND VENUE | | 12 |
| IV. | BACKGROUND | | 13 |
| | A. | Overview of Role of Insurance Companies in Fully Insured and Self-Funded Health Plans | 13 |
| | B. | In a Functioning Market, Insurers and Health Care Providers Negotiate in Ways That Reduce Costs and Realize Efficiencies | 18 |
| | C. | In a Market Distorted by Anticompetitive Behavior, These Competitive Mechanisms Are Not Available | 24 |
| V. | ANTICOMPETITIVE CONDUCT | | 27 |
| VI. | ANTICOMPETITIVE EFFECTS | | 34 |
| | A. | NYP's Prices Drive Up Costs for Payors | 34 |
| | B. | NYP Charges Supracompetitive Prices Throughout the Relevant Geographic Markets and the State of New York. | 35 |
| VII. | RELEVANT MARKETS | | 47 |
| | A. | Relevant Product Market | 48 |
| | B. | Relevant Geographic Market | 49 |
| VIII. | NEW YORK PRESBYTERIAN'S MARKET POWER | | 52 |
| IX. | NO PROCOMPETITIVE BENEFIT JUSTIFIES NEW YORK PRESBYTERIAN'S ANTICOMPETITIVE CONDUCT | | 64 |
| X. | CLASS ALLEGATIONS | | 64 |
| | A. | Class Definition | 64 |
| | B. | Certification Requirements | 65 |

XI.     STANDING ...................................................................................................67

XII.    CLAIMS FOR RELIEF ..............................................................................69

     Count One: Restraint Of Trade In Violation Of The Sherman Act (15 U.S.C. § 1) .......69

     Count Two: Restraint Of Trade In Violation Of The Donnelly Act (N.Y. Gen Bus. Law § 340, *et seq.*).....................................................................................71

     Count Three: Unjust Enrichment .....................................................................73

XIII.    JURY DEMAND .......................................................................................73

XIV.    PRAYER FOR RELIEF .............................................................................73

Plaintiffs Cement and Concrete Workers DC Benefit Fund ("CCWDC Welfare Fund"), United Food and Commercial Workers ("UFCW") Local 1500 Welfare Fund ("UFCW Local 1500 Welfare Fund"), and Pointers, Cleaners & Caulkers Local 1 Welfare Fund ("PCC Local 1 Welfare Fund"), individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), bring this civil antitrust action against Defendant The New York and Presbyterian Hospital ("Defendant" or "NYP") for unlawfully restraining trade in violation of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340. Plaintiffs seek damages and an injunction forbidding NYP from using unlawful restrictions that prevent or inhibit New York employers, unions, local government entities, and other health plan sponsors (collectively, "self-funded payors") and health insurance companies from incentivizing patients to use lower cost and higher quality healthcare services offered by NYP's competitors. These unlawful restrictions restrain trade, reduce competition, and increase healthcare prices to the detriment of New York employers, unions, and consumers.

## I.   NATURE OF THE ACTION

1. NYP is one of the largest hospital systems in the United States. It provides a comprehensive range of healthcare services across six general acute care hospitals, including at its flagship facilities, Columbia University Irving Medical Center and Weill Cornell Medical Center. It also owns many outpatient facilities and physician groups in New York City. Within New York City, NYP is the largest hospital system by net revenue, inpatient days, and certified beds, with operating revenues of over $13 billion in 2024. NYP is also, by far, the most expensive hospital system in New York.

2. NYP has market power in the market for inpatient general acute care ("inpatient GAC") hospital services. Its market power is built on the scale, breadth, and configuration of its providers, including, among other things, its large size, many locations, perceived status and

1

reputation, and dominant market position in certain critical service lines, such as cardiology and obstetrics. NYP's market power also comes from competitive dynamics that are unique to the hospital context: Health insurance companies that assemble provider networks cannot exclude a major health system like NYP from all of the networks they offer in New York City without jeopardizing their commercial viability. Direct evidence of NYP's market power includes its ability to impose anticompetitive contractual restraints, its ability to profitably and persistently charge supracompetitive prices, and its inclusion in all or nearly all health insurance products in the relevant geographic markets despite these supracompetitive prices.

3. NYP leverages its market power to, through contractual restrictions and otherwise, inhibit the creation of provider networks and health plans that are designed to lead to lower healthcare costs while providing members with equal- or higher-quality care. In the absence of NYP's restrictions, the health insurance companies, such as Anthem or United, would create provider networks and benefit structures (e.g., coverage, copays, and coinsurance) that encourage price competition among providers, thereby lowering the prices providers will charge for healthcare.

4. This is referred to in the industry as "selective contracting"—the ability to create the conditions that foster price competition among healthcare providers for inclusion in the provider networks insurance companies assemble. Put simply, selective contracting puts significant pressure on providers to lower their prices in order to be included in network (or given favorable placement within a given network).

5. The simplest form of selective contracting involves excluding a healthcare provider, or certain of the provider's facilities, from a particular health plan network unless that provider lowers its price to a level competitive with peer providers. Because most members (*i.e.*,

2

patients) choose to see "in-network" providers that are in the insurance network they subscribe to, the threat of being excluded from insurance networks in this way is a powerful downward pressure on the price a healthcare provider is willing to charge for its services.

6. Another form of selective contracting employed to lower prices is "steering." Health plans "steer" their members to lower-cost and/or higher-quality providers by incentivizing patients (usually financially, e.g., through lower out-of-pocket costs to the patient) to receive care from such providers. This, in turn, incentivizes providers to lower their prices to ensure the network steers patients towards them (or at least does not steer patients away from them), resulting in more volume and revenue for the provider.

7. Types of steering include:

- "tiering," in which plans will place lower-cost and higher-quality providers in a higher benefit tier, incentivizing members to choose providers that present lower costs for payors by offering lower costs (such as copays or coinsurance) for members;

- "site of service" steering provisions, which encourage patients to have procedures done in a lower-cost location (such as an outpatient clinic) rather than a higher-cost location (like a hospital);

- "centers of excellence" provisions, which reduce members' out-of-pocket costs if they choose to have procedures done at particularly efficient facilities; and

- price transparency provisions, which enable members to see the costs of a procedure at various facilities.

8. Extensive research demonstrates that these types of steering significantly reduce the cost of healthcare for payors of healthcare (*i.e.*, self-funded employers, unions, and other entities that pay directly for the healthcare of their members; together, "Payors") and consumers. These savings occur for two principal reasons. First, health plans with these provisions cause more members to obtain more care from lower-cost, higher-quality providers than they otherwise

3

would, which directly reduces the Payors' expenditures, and often their members' own too. Second, insurance companies negotiating the creation of cost-effective products through the use (or threatened use) of selective contracting can negotiate lower prices across the board if providers fear being excluded from a network or steered away from a network; this increased competitive pressure inures directly to Payors' benefit, because the prices Payors pay are the prices negotiated between the insurance company and the healthcare provider. Put differently, in a functioning market, providers are motivated to be included in broad and narrow networks, and to have Payors' members steered towards them (or at least not steered away from them), because of their desire for increased patient volume. Thus, the ability of Payors to design and implement cost-effective plans gives providers a powerful incentive to be as efficient as possible, maintain low prices, and offer high-quality and innovative services. This benefits Payors and members tremendously by lowering their healthcare expenses, whether or not they actually utilize these cost-saving plan designs.

9. In short, selective contracting is procompetitive. By encouraging plan members to seek care at more cost-effective providers, selective contracting incentivizes providers to compete on price, quality, choice, and other factors. The economic literature amply demonstrates that selective contracting lowers prices significantly for Payors, and that interference with the selective contracting process by a powerful provider like NYP raises the prices Payors pay.

10. NYP uses its market power to restrict the use—or even threatened use—of selective contracting to implement cost-effective health plan designs that would steer patients to higher-value care from non-NYP facilities. NYP does so to protect itself against price competition that would deprive it of patient volume and require it to lower its extremely high prices.

11. Specifically, NYP uses its market power to force the insurance companies assembling provider networks, as a condition of including any NYP facilities in their networks, to agree to anticompetitive "all-or-nothing" and "anti-steering" terms. A primary restraint NYP uses to impose these terms is referred to as an "All Products" restraint, which NYP forces onto all or nearly all insurance companies that offer network products (*i.e.*, health plans) to Payors.

12. Through the All Products restraint, NYP requires an insurance company assembling provider networks that wishes to include *any* NYP provider or facility in *any* of its networks to include *all* NYP providers and facilities in *all* of the insurance company's networks, at the highest tier or benefit level—regardless of cost or quality. This obstructs insurance companies from designing networks that would include some but not all of a provider's facilities, or exclude a particular provider altogether. It also effectively prevents steering—any insurance company that must (or effectively must) include any NYP facility or provider in any of the networks it designs is effectively prohibited by NYP from designing a network that places NYP in a disadvantaged tier or otherwise works to steer patients to lower-cost, higher-quality competitors of NYP's.

13. NYP also imposes "single negotiated rate" provisions, which force insurers to accept the same rate that NYP charges at its expensive flagship hospitals when their members obtain care at one of NYP's lowest-rated hospitals. This form of "take it or leave it" pricing keeps NYP's prices artificially high and further demonstrates NYP's market power.

14. NYP also imposes "gag clauses" which prevent Payors from disclosing the terms of NYP's pricing—and its anticompetitive terms, like the All Products provision—to their members, preventing members from knowing the cost of care at NYP before they receive it.

15.     NYP's All Products provision and other contractual restraints unlawfully insulate NYP from competition and have allowed NYP to persistently charge higher prices to New York businesses, unions, local governments, insurers, and taxpayers—*i.e.*, Payors and their members. Payors like Plaintiffs pay substantially more than they otherwise would for healthcare as a direct result of NYP's anticompetitive restraints. In addition, these restraints deprive Payors and patients of a choice among a full spectrum of competitive health insurance products. Payors, including Plaintiffs, would like the ability to select and offer cost-effective networks to their members to lower healthcare costs, but NYP's restraints—as a practical matter—prohibit insurance companies from creating such networks and thereby make them unavailable to Payors.

16.     NYP's anticompetitive conduct causes antitrust injury to Plaintiffs and the proposed Class (as defined below) because it results in higher prices paid by New York employers, unions, insurers, and individuals for healthcare. NYP's high prices are apparent in common, high-volume procedures like joint replacements, which at NYP's facilities cost $37,456 more than at NYU Langone, a competitor with higher safety and quality ratings, representing a 68% premium charged by NYP for the same procedure. And they are apparent in cumulative numbers that show NYP is by far the most expensive hospital system in New York, with ***the average inpatient stay at NYP costing 74% more than the average of other major New York City hospitals***. These prices are substantially higher than NYP would be able to charge absent the All Products restraint and other contractual restrictions NYP uses its market power to impose.

17.     The purpose of NYP's restraints is to insulate it from price competition—or, as NYP calls it, "erosion of rates of payment"—by precluding or restricting Payors from encouraging members to seek care from nearby cheaper competitor hospitals offering a similar

6

or higher quality of care. If Payors were able to take these actions (or even realistically threaten to), this would lead directly to more patients obtaining care from NYP's lower-priced competitors and to lower prices at NYP facilities.

18. NYP knows that its restraints have this effect. In a recent strategic planning document, NYP acknowledged that there is "consumer price sensitivity" among patients. If consumers could act on this sensitivity by selecting cost-effective products, NYP might experience "pricing pressure" because of its high prices, which could "impact [NYP's] margins"—that is, its profits from treating patients.

19. After Plaintiffs filed this case, the U.S. Department of Justice ("DOJ") filed a lawsuit against NYP in the Southern District of New York, alleging that the same conduct alleged here violates federal antitrust law for substantially the same reasons Plaintiffs allege. *See* Complaint, *United States v. New York & Presbyterian Hosp.*, No. 26-cv-2480 (S.D.N.Y. Mar. 26, 2026), ECF No. 1. Like Plaintiffs here, the DOJ alleges that "NYP's plan restrictions harm the process by which NYP and other [New York] hospitals would otherwise compete on the prices of the services they sell" and that NYP's restrictions on cost-effective plans "do not have any procompetitive effects." *Id.* ¶¶ 41, 51. The DOJ seeks "an order prohibiting NYP from entering into or enforcing these illegal contractual plan design restrictions, which reduce competition among hospitals, raise healthcare costs, and deny consumers seeking healthcare in New York City access to budget-conscious health insurance plans." *Id.* at 1.

20. This is not the first time that the DOJ has sought to enjoin the use of anticompetitive anti-steering restraints by dominant hospital systems. In February 2026, the DOJ filed a lawsuit against a dominant hospital system in Ohio alleging that its anti-steering provisions violate federal antitrust law. *See United States v. OhioHealth Corp.*, No. 2:26-cv-207

7

(S.D. Ohio Feb. 20, 2026), ECF No. 1. In addition, state legislatures across the nation, including in both Republican- and Democratic-controlled states such as Texas, Indiana, Massachusetts, Nevada, and Connecticut, have recognized that the use of anti-steering provisions by hospital systems is anticompetitive and have banned such restrictions. Courts also routinely recognize that allegations centered on anti-steering restraints adequately plead anticompetitive conduct. *See, e.g.*, *In re Mission Health Antitrust Litig.*, No. 1:22-CV-00114, 2024 WL 759308 (W.D.N.C. Feb. 21, 2024); *Uriel Pharm. Health & Welfare Plan v. Advoc. Aurora Health, Inc.*, 2023 U.S. Dist. LEXIS 251745, at *8–11 (E.D. Wis. Apr. 28, 2023); *Davis v. HCA Healthcare, Inc.*, 2022 WL 4354142, at *13–14 (N.C. Sup. Ct. Sept. 19, 2022); *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404, 2017 WL 1359599 (N.C. Super. Apr. 11, 2017).

21.     Finally, dominant hospital systems across the country themselves have recognized that restrictions on selective contracting they previously imposed are anticompetitive and have agreed to stop using them. For instance, in response to an antitrust enforcement action filed by the United States Department of Justice and the State of North Carolina, the Atrium Health system in North Carolina consented to a final judgment "enjoin[ing] [Atrium Health] from prohibiting, preventing, or penalizing steering…." Final Judgment at 2, *United States v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16-cv-00311 (W.D.N.C. Apr. 24, 2019), ECF No. 99. In Northern California, the Sutter Health hospital system paid $575 million to settle an antitrust action brought in California state court by the California Attorney General and a class of self-funded payors challenging Sutter's use of anti-steering provisions. Sutter also agreed to sweeping injunctive relief—overseen by a monitor for 10 years—pursuant to which the hospital system, among other things, "may not veto, interfere with, or otherwise engage in any action, direct or indirect, to prevent the introduction of new narrow, tiered, or steering Commercial

Products….” Judgment, Ex. 1 at 7, *UFCW & Emps. Benefit Tr. v. Sutter Health*, No. CGC-14-538451 (Cal. Super. Ct. Aug. 27, 2021).

22. Despite its nominal nonprofit status, NYP has profited handsomely from its anticompetitive restraints. In 2022, NYP's revenue was $10.7 billion, and its net operating income was $201 million. In 2023, NYP's revenue increased to $12.5 billion and its net operating income increased to $343 million. In 2024, NYP's revenue increased to $13 billion and its net operating income increased to $385.6 million.

23. NYP uses these outsized profits to pay extraordinary amounts to the executives of this supposedly charitable institution. According to NYP's most recent reporting, the total compensation of NYP's former President and CEO, Steven Corwin, was $26.3 million in 2024. Mr. Corwin was not alone. NYP reports that, in 2024, over 30 other officers, directors, trustees, key employees, and highest compensated employees (including formers) received seven-figure compensation, including individual compensation as high as $6.5 million. In the three years prior to 2024, Mr. Corwin's compensation totaled $39.3 million, while the total annual compensation of other NYP executives was as high as $7.7 million.

24. By claiming nonprofit status despite being a multi-billion-dollar profitable enterprise, NYP avoids paying hundreds of millions of dollars in federal, state, and local taxes on profits by promising to pursue a primarily charitable purpose. At the same time, NYP has been criticized for providing too little charity care, suing patients who can't afford to pay, and engaging in aggressive practices to undermine union health plans' efforts at cost savings.

25. NYP's anticompetitive contracting restrictions restrain trade, suppress competition, inflate prices, and harm Payors—including thousands of New York employers, unions, insurers, and their members. Further, NYP's conduct remains ongoing. As a direct result,

Payors—including Plaintiffs—have paid overcharges of hundreds of millions of dollars, if not more, for inpatient general acute care services (defined below) during the Class Period. Plaintiffs therefore bring this action on behalf of a Class (defined below) to recover the damages caused by NYP's unlawful overcharges and to obtain injunctive relief to bar these practices, thereby increasing Payor and patient choice and access to lower-cost, higher-quality healthcare.

## II. PARTIES

### A. Plaintiffs

26. Plaintiff CCWDC Welfare Fund is a self-funded union health plan that provides health benefits to over 1,700 union members, dependents, and retirees of the Cement & Concrete Workers District Council in New York City. CCWDC Welfare Fund is headquartered in this judicial district. NYP is included in CCWDC Welfare Fund's network, which is subject to the anti-steering, All Products, and other restraints outlined below. CCWDC Welfare Fund has used its funds to purchase inpatient services directly from NYP at NYP's inflated prices, including at NYP facilities in this district over the past four years.

27. Like other Payors with members in the New York City area, CCWDC Welfare Fund has struggled with the rising cost of healthcare and the rising prices charged by NYP.

28. Plaintiff UFCW Local 1500 Welfare Fund is a self-funded employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York. UFCW Local 1500 Welfare Fund is a multi-employer benefit fund that provides healthcare benefits to members and dependents of the union, UFCW Local 1500. It offers members and dependents hospital benefits as part of the healthcare benefits it provides. NYP is included in UFCW Local 1500 Welfare Fund's network, which is subject to All Products and other anti-steering restraints outlined below. UFCW Local 1500 Welfare Fund has used its funds to

10

purchase inpatient services directly from NYP at NYP's inflated prices, including at NYP facilities in this district over the past four years.

29. UFCW Local 1500 is New York's largest grocery store union. With nearly 14,000 members, the union is one of the largest locals in the entire UFCW. The union represents people throughout New York, including residents of Queens, Staten Island, the Bronx, Brooklyn, and Manhattan, as well as Nassau, Suffolk, Westchester, Putnam, and Dutchess Counties. Union members work for a variety of grocery stores across New York, such as Fairway, King Kullen, D'Agostino's, Stop and Shop, Gristede's, and Shoprite. The union has existed for almost 90 years.

30. Like other Payors with members in the New York City area, UFCW Local 1500 Welfare Fund has struggled with the rising cost of healthcare and the rising prices charged by NYP.

31. Plaintiff Pointers, Cleaners, and Caulkers Local 1 Welfare Fund is a self-funded union health plan that provides health benefits to over 2,500 union members, dependents, and retirees of the Pointers, Cleaners and Caulkers Local 1 union. PCC Local 1 Welfare Fund is headquartered in this judicial district. NYP is included in PCC Local 1 Welfare Fund's network, which is subject to the anti-steering, All Products, and other restraints outlined below. PCC Local 1 Welfare Fund has used its funds to purchase inpatient services directly from NYP at NYP's inflated prices, including at NYP facilities in this district over the past four years.

32. Like other Payors with members in the New York City area, PCC Local 1 Welfare Fund has struggled with the rising cost of healthcare and the rising prices charged by NYP.

**B. Defendant**

33. Defendant NYP is a New York not-for-profit corporation with its principal place of business in New York, New York. It may be served with process by the Secretary of State by

mail at New York-Presbyterian Hospital, Office Of Legal Affairs and Risk Management, Box 36, 466 Lexington Avenue, 13th Floor, New York, NY 10017. NYP provides medical services at more than 190 locations and encompasses hospital campuses, primary and specialty care clinics and medical groups, and an array of telemedicine services. NYP is one of the nation's largest hospital systems and provides inpatient, ambulatory, and preventive care in all or substantially all areas of medicine. NYP has over 4,000 beds and more than 10,000 affiliated physicians. NYP sees more than two million visits annually.

34. NYP as it currently exists is the result of a lengthy and aggressive merger and acquisition strategy. NYP has described itself as a "health-care powerhouse" due to its mergers and touted that it was the first academic hospital system in the country "to achieve total consolidation." NYP acquired a hospital in Cortlandt, New York in late 2014, acquired New York Methodist Hospital in Brooklyn in December 2016, and has acquired or affiliated with numerous inpatient and outpatient practices in recent years.

35. Except where otherwise noted, "New York Presbyterian" or "NYP" as used herein refers to all of New York Presbyterian's facilities in the Relevant Geographic Markets (defined below).

### III. JURISDICTION AND VENUE

36. This Court has personal jurisdiction over NYP because NYP is a resident of New York and because the anticompetitive conduct at issue in this litigation took place primarily in New York.

37. This Court has subject matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 15, 15 U.S.C. § 25, 28 U.S.C. § 1331, and 28 U.S.C. § 1337. This Court has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367(a). Exercising

jurisdiction over the state law claim will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

38. Venue is appropriate in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22 because NYP transacts business in this district and/or because a substantial part of the events or omissions giving rise to this action occurred in this judicial district, including that Plaintiffs purchased inpatient services from NYP facilities in this district and that NYP's conduct caused harm to Plaintiffs in this district.

39. NYP engages in interstate commerce and in activities substantially affecting interstate commerce. NYP provides healthcare services for which employers, unions, insurers, and individual patients remit payments across state lines. NYP also purchases supplies and equipment which are shipped across state lines and otherwise participates in interstate commerce.

## IV. BACKGROUND

### A. Overview of Role of Insurance Companies in Fully Insured and Self-Funded Health Plans

#### i. Unlike for Fully Insured Plans, Employers Offering Self-Funded Health Plans Bear Financial Responsibility for Paying Members' Bills

40. Many businesses, unions, and local governments pay for their employees' or members' healthcare through health plans designed by insurance companies (like Anthem BCBS or United) that they offer to employees and members. In general, there are two different models for such plans: fully insured health plans and self-funded health plans.

41. In a "fully insured" health plan, the employer and its employees pay premiums to the insurance company which, in turn, bears the risk of loss and pays the bills from hospitals and other providers. Employees often pay a portion of the premium out of their paychecks, along

with out-of-pocket costs in the form of deductibles, copays, and/or coinsurance. For fully insured plans, then, the insurance company actually acts as an insurer—it pools the risk of all the plan's members and is financially responsible for their healthcare costs, and it pays providers for the vast majority of the expense of the members' care. Thus, when it comes to individuals who subscribe to fully insured healthcare plans, the insurance company is the payor for healthcare services.

42. In a "self-funded" health plan, by contrast, the employer or union bears the financial risk for the healthcare costs of the plan's members, and directly pays the vast majority of the healthcare expenses those members (*i.e.*, the employer or union's employees and their dependents) incur. Thus, when it comes to individuals who subscribe to self-funded health plans, the employer or union funding the plan is the payor for healthcare services ("self-funded payor").

43. The entity that bears financial responsibility for paying the healthcare expenses incurred by a given health plan's members is called a "Payor." As described above, for fully insured health plans, the Payor is the insurance company, and for self-funded plans the Payor is the self-funded payor (e.g., the employer or union that funds the plan).

ii. **Insurance Companies Play Other Roles in the Provision of Healthcare**

44. As noted above, for fully insured health plans, the insurance company acts as an insurer—it bears the risk of loss and is financially responsible for the cost of members' care. Self-funded payors, by contrast, do not use insurance companies to insure anything—instead, they bear the risk of loss and are financially responsible for the cost of their members' care.

45. But self-funded payors do generally utilize an insurance company (like Anthem BCBS or United) to obtain two separate, non-insurance services: (1) access to a network of healthcare providers that the insurance company has assembled by negotiating contracts with

14

those providers; and (2) claims processing, including arranging payments from the self-funded payor to the healthcare provider to pay for care rendered to the payor's employees. When health insurance companies act in that first capacity—negotiating and contracting with providers to assemble networks of providers—they are acting as "Network Vendors." When health insurance companies perform that second role—administering the claims processing for self-funded payors—they are acting as a "Third Party Administrator" or "TPA."

46. ***Network Vendors.*** When acting as a Network Vendor, an insurance company (like Anthem BCBS or United) assembles healthcare "provider networks," which consist of the providers with whom an insurer has a contract to provide services to the members of health plans (both self-funded or fully insured) at rates the insurance company negotiates with providers. This leads to the commonly used term of a provider being "in-network" for a health plan. In-network rates (also known as "allowed amounts") are prices negotiated between insurance companies and providers for each type of service offered by healthcare facilities and healthcare professionals. Members typically receive more generous coverage from their health plan when they visit an in-network provider, which incentivizes them to do so. Going to an "out of network" provider, by contrast, generally means higher costs and more uncertainty for both the Payor's member (in terms of out-of-pocket costs, frequent surprise bills, and paperwork burden) and the Payor itself (in terms of higher prices than those charged by in-network providers and significant administrative burden). It is in these negotiations—between Network Vendors and NYP over NYP's inclusion in-network—that NYP imposes the restraints at issue in this litigation.

47. For practical reasons, most self-funded payors do not assemble their own provider networks. It would be practically impossible for every employer, union, and local government to conduct individual negotiations with the many providers where employees and dependents

might receive care. Providers would also find it burdensome, if not impossible, to negotiate thousands of separate contracts with individual self-funded payors.

48. Accordingly, self-funded payors access provider networks for their members through Network Vendors. Network Vendors tend to be large, well-known insurance companies like Anthem BCBS (formerly known in New York as Empire BCBS), United HealthCare, and Cigna, which have the scale and technical knowledge to build networks. After a Network Vendor creates a network of providers, it charges self-funded payors a fee to access the network. For example, CCWDC Welfare Fund, UFCW Local 1500 Welfare Fund, and PCC Local 1 Welfare Fund pay a set of fixed fees to Anthem BCBS to access its networks; Anthem is these Plaintiffs' Network Vendor.

49. Network Vendors negotiate with providers on price, attempting to balance the need to build networks with an adequate number of providers and the need to build networks that offer reasonable prices. The prices negotiated between Network Vendors and providers for in-network care are known as "allowed amounts," which generally represent the price the self-funded payor is contractually obligated to pay the provider for that care. In this way, a Network Vendor negotiates with the hospital the price that the self-funded payor will pay for its members' care, and the self-funded payor is obligated to pay that price to the provider when one of its members receives care from that provider.

50. When Network Vendors negotiate networks in this way, the networks that result can be used either by employers with self-funded health plans or employers with fully insured health plans. That is, the networks of providers that Network Vendors build to support their own insurance businesses are, in general, the networks that will be available to an employer's

members, regardless of whether that employer decides to offer its employees a fully insured plan or a self-funded plan.

51.    ***Third Party Administrators.*** A separate service insurance companies regularly offer to self-funded payors is playing the role of a Third Party Administrator ("TPA"). When acting as a Third Party Administrator to a self-funded plan, an insurance company (like Anthem BCBS or United) performs an administrative service: It processes claims for payment that come in from a provider after a patient covered by that plan receives care, and in many cases it also transmits the self-funded payor's funds to the provider in the appropriate amount. TPAs also serve other administrative functions, such as calculating the allowed amount, calculating deductibles, copays, and coinsurance, and adjudicating claims disputes. In their capacity as payment processors, insurance companies do not pay any of their own funds to the provider; like a wire-transfer or credit-card service, the TPA simply facilitates the payment that the self-funded payor owes to the provider for the care the payor's employee received. In exchange, the self-funded payor typically pays the TPA a per-member, per-month administrative services fee.

52.    When insurance companies operate as either Network Vendors or TPAs for self-funded payors, they do not purchase any services from the healthcare provider—in neither capacity is the insurance company ever financially responsible to the provider for the amount the provider is owed. Typically, the insurance company's contracts with both providers and self-funded plans will expressly disclaim any such liability. Thus, self-funded payors are the entities that are financially responsible to the healthcare provider for the services provided to the plan's members. Because of this, when a self-funded payor's member receives care from a provider, but the self-funded payor does not pay (or underpays) for the service, the provider generally cannot and does not seek payment from the insurance company (*i.e.*, the Network Vendor or

TPA)—it seeks payment from the self-funded payor. Put differently, self-funded payors, such as CCWDC Welfare Fund, UFCW Local 1500 Welfare Fund, and PCC Local 1 Welfare Fund, contractually retain all financial risk for their health benefit plans with NYP.

**B. In a Functioning Market, Insurers and Health Care Providers Negotiate in Ways That Reduce Costs and Realize Efficiencies**

53. The market for hospital services is different from other product and services markets because the person consuming the hospital services (the patient) does not negotiate— and in many cases, does not even know beforehand—the price of the services they are consuming. Nor does the patient typically pay the vast majority of the costs of the medical services they consume. Instead, for insured individuals, those costs are paid primarily by their health insurance plan.

54. In assembling provider networks, whether for fully insured or self-funded plans, Network Vendors need to consider the desires of employers and employees that will use those networks, both in terms of the composition of the network (e.g., ensuring adequate coverage across key specialties and across geographies) and in terms of the in-network prices (or "allowed amounts") that the Network Vendor negotiates with providers. For a Network Vendor's network to be commercially viable (i.e., for it to be one an employer or union would choose to offer its employees or members), it must include enough providers across the full spectrum of healthcare services patients may need or want, from primary care to complicated inpatient hospital surgical care to specialty practices. And because members generally insist on receiving their healthcare near where they live or work, the network(s) a Payor offers its members will not be viable if the provider network does not include a sufficient number of providers in these locations. The network(s) must also include any providers and facilities that Payors and a significant number of their members demand to be able to access at in-network rates.

55. Network Vendors generally do not engage in a separate negotiation for each covered medical service. Rather, Network Vendors generally engage in a single negotiation for clusters of services that will be available to Payors that use the network. Those Payors then offer that entire cluster of services to their members as in-network benefits. If a Network Vendor and a hospital reach a deal for a cluster of services (for instance, all inpatient GAC hospital services at a given facility), the hospital will generally be considered in-network for every service in that cluster. This means that for any service in that cluster, if a Payor's member receives that service from the hospital, the patient will pay the required out-of-pocket costs set forth in their health plan documents, and the Payor will pay the hospital the remaining portion of the allowed amount the Network Vendor negotiated.

56. ***Selective Contracting.*** In competitive markets—markets in which there is free competition among a large number of hospitals or other facilities for inclusion in health insurance products available to Payors and their members—a Network Vendor will contract with a hospital or other facility for a bundle of services only when the hospital offers services that are competitively priced and of sufficiently high quality. Network Vendors may, and in competitive markets often do, decline to include in their networks any services from a hospital or other facility if that hospital's or facility's prices or quality of care are not competitive with other nearby providers. Similarly, a Network Vendor may include as in-network only some clusters of services at any given hospital or hospital system. For instance, the Network Vendor may include a hospital in-network for all inpatient GAC hospital services but may choose not to include that hospital in-network for outpatient hospital services (visits not requiring an overnight stay). The Network Vendor may do so because it has identified ways to create networks that allow Payors

and their members to purchase higher quality care and/or less expensive versions of those outpatient services from a nearby competing hospital or another outpatient provider.

57. In competitive markets, these dynamics spur price and quality competition among providers. Hospitals negotiating contracts with Network Vendors know that if their prices are too high or their quality of care too low, the Network Vendors will decline to contract with them and will instead contract with other, higher-value providers. Providers generally do not want to be excluded from insurance networks because patients are much less likely to obtain medical services from an out-of-network provider, and collecting revenue for out-of-network care is slower, more expensive, and more uncertain, so exclusion from networks deprives the provider of patient volume and revenue.

58. These competitive dynamics allow Network Vendors to assemble, among other cost-effective products, "narrow networks," which are network offerings that consist of a smaller set of healthcare providers than broad networks, and typically exclude the most expensive providers. Because narrow networks (in a functioning market) include fewer providers and exclude the most expensive ones, providers will offer a substantial reduction on price for inclusion in the network, given that inclusion in a narrow network likely means a higher proportion of patients in that network will seek care from a given provider (*i.e.*, greater volume to the participating providers). Payors may offer their members a choice between a broad network plan and a narrow-network plan, and members who choose the narrow network plan pay lower premiums and lower out-of-pocket expenses. By offering narrow-network plans, Payors can achieve lower costs when at least some members choose a narrow-network plan and, at the same time, incentivize providers to lower their prices so that they will be included within both the broad and narrow networks. Payors' ability to offer to their members both a broad-

20

network option and a narrow-network option allows them to reduce costs while still meeting the needs of members who want or need wider access. This creates downward pressure on providers' prices more generally, thus lowering overall spending on hospital care even for Payors that choose not to offer such narrow-network options to their members. The availability of narrow network options enhances price competition among providers, thereby lowering the prices providers charge across the board.

59. Beyond removing high-cost providers from their networks, Network Vendors can secure low prices from hospitals and other providers through various cost-effective plan designs or the threat of implementing such designs; this, in turn, leads to savings for the Payors who use those networks. For example, Network Vendors may, for a variety of reasons, include both higher-cost and lower-cost providers within the same network but incentivize (or "steer") their members to obtain care from one of the lower-cost providers that offers the same or better quality of care. Alternatively, Payors might seek access to a network that has fewer providers in-network, but which results in lower charges paid by the Payor and its members. Payors might also decide to charge their members lower copays or lower coinsurance percentages if they use lower-cost providers.

60. The threat of steering creates incentives similar to those created by the threat of exclusion from a network. If providers know that they *could* lose patient volume because their prices are too high, they are less likely to demand unjustifiably high prices. Steering—or even the possibility of steering—therefore enhances price competition between hospitals for inclusion in networks and/or preferential treatment within a network or health insurance plan designed to steer more patients towards better value providers.

61. One form of steering, called "tiering," involves the creation by Network Vendors of "tiered" networks or "tiered" plans, in which low-cost, high-quality providers are placed in a higher "tier" than more expensive and/or lower-quality competitors, and the plan's members are then incentivized (e.g., through lower out-of-pocket costs, such as more generous co-insurance coverage) to choose providers in a higher tier.

62. "Site of service" steering is a plan feature that saves Payors and patients money by incentivizing patients to have procedures done in a lower-cost location (such as an ambulatory surgery center or outpatient imaging center) instead of a higher-cost site of service, such as a hospital.

63. A "center of excellence" is a cost-effective plan design feature that gives patients with broad network plans an incentive to seek specific healthcare services from designated groups of providers that offer better value for those specific services within a broad network. When creating or subscribing to a "center of excellence," Network Vendors and Payors identify specific cost-effective programs of excellent quality—such as orthopedic surgery or oncology programs—and encourage their members to choose care at those facilities by reducing or waiving the fees that the member must pay. Members can then choose whether to seek care from the "center of excellence" providers that their plan has designated or to seek care from costlier providers at a higher price.

64. Increased price transparency is another form of steering. If Network Vendors and Payors provide their members with truthful information about the prices for various services at competing facilities, their members are more likely to choose to obtain services at lower-cost facilities, even in the absence of any additional incentives provided by tiering like reduced copays or premiums. For example, a member who does not expect to meet her deductible in a

22

given year may choose a lower-cost facility regardless of whether doing so results in lower copays or premiums.

65. Because these plan design tools allow members to save money by choosing cost-effective hospitals and other providers while still obtaining high-quality care, they create price and quality competition among providers. Academic research by health economists has demonstrated that when Network Vendors are free to create and Payors are free to implement these cost-effective plan designs, Payors pay significantly lower costs for healthcare, with no corresponding reduction in health outcomes. Peer-reviewed research studies find that steering reduces healthcare costs by significant amounts.

66. Cost-effective plan design not only helps Payors save money on healthcare provided to a particular patient; it encourages higher-priced providers to lower their prices so that Payors steer members toward them, or at least do not steer away from them. Cost-effective plan designs, including steering, tiering, and narrow networks, are thus important tools that Network Vendors and Payors can use to exert downward price pressure on hospitals and providers. For example, a Network Vendor could secure lower prices from a hospital or other provider by agreeing to place that hospital or provider in the most-preferred tier of its tiered network or to include it in both its narrow-network and broad-network plans.

67. As detailed below, NYP impedes this competition by restricting Payors from offering cost-effective plans that would result in more patients choosing rival hospitals and other providers instead of high-priced NYP providers. NYP's restrictions do not allow the essential features of competition to take hold in New York City.

**C.     In a Market Distorted by Anticompetitive Behavior, These Competitive Mechanisms Are Not Available**

68.     The unique mechanics of the healthcare market provide an opportunity for hospital systems with market power to anticompetitively restrain trade through unduly restrictive contracts to extract supracompetitive prices. Supracompetitive prices are rates that are higher than would result from competition. In the market for hospital services, supracompetitive prices come in the form of inflated allowed amounts, which are the rates negotiated by Network Vendors and paid by Payors.

69.     Examples of anticompetitive behavior that hospital systems with market power may engage in is the imposition of various "all-or-nothing" and/or "anti-steering" provisions in agreements with Network Vendors. These measures which thwart selective contracting can take many forms, such as preventing or restricting the creation of networks and health plans that (1) favor other providers through financial incentives or other inducements, (2) place other providers in a higher tier than the dominant hospital system, (3) employ "narrow networks" that exclude the dominant system or some of that system's high-priced providers, (4) allow the sharing of truthful pricing information with plan members, or (5) encourage members to seek care at centers of excellence and/or lower-cost locations (site of service). These provisions restrict or block cost-effective plan designs and thus, price competition. As detailed below, NYP imposes such restraints on all or nearly all contracts with Network Vendors and the health plans Network Vendors offer to Payors. This includes, but is not limited to, NYP's imposition of the All Products restriction in its contracts with all or nearly all Network Vendors (which create the networks used by all or nearly all Payors).

24

70. There is a widespread, bipartisan consensus that anti-steering restrictions like the All Products provision harm competition and result in higher prices for insurers, employers, unions, and consumers.

71. In 2016, the Department of Justice brought a Sherman Act suit against Atrium Health, a North Carolina hospital system that imposed anti-steering provisions on payors in the Charlotte area. In the lawsuit, the government alleged that the system "prevent[ed] insurers from offering tiered networks that feature hospitals that compete with [the system] in the top tiers, and prevent[ed] insurers from offering narrow networks that include only [the system's] competitors." The government further alleged that these and other "steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers." After a federal court held that the system's use of anti-steering provisions was plausibly anticompetitive under the Sherman Act, the case settled, and the system agreed not to impose anti-steering and anti-tiering provisions on payors going forward.

72. In 2018, the Deputy Assistant Attorney General for the Antitrust Division under President Trump also criticized anti-steering provisions, saying, "Without these provisions, insurers could promote competition by 'steering' patients to medical providers that offer lower priced, but comparable or higher-quality services. Importantly, that practice benefits consumers, but the anti-steering restrictions prevented it."

73. President Biden's Secretary of Health and Human Services, Xavier Becerra, wrote in his previous role as California Attorney General that contracting practices that "prevented insurers from using steering and tiering" were among the types of "anticompetitive conduct" that "discouraged competition, impaired price-conscious consumer choice, and

resulted in inflated prices on a system-wide basis that exceed its competitors and exceed the prices its hospitals and its other providers could charge in a free, competitive market."

74.     A 2020 research report on "Preventing Anticompetitive Contracting Practices in Healthcare Markets" by researchers from the Petris Center and UC-Hastings College of Law describes how "[h]ealth systems with market power can [] use anti-incentive clauses, also known as anti-steering and anti-tiering clauses, to hinder competition on price and quality."

75.     A May 2022 academic study in *Health Affairs* concluded that tools like steering, tiering, and transparency in pricing are particularly important to preserve competition after mergers and acquisitions like the ones NYP has engaged in: "In addition to proactive oversight of mergers, acquisitions, and joint contracting, the actions of policy makers, insurers, and employers to empower health care consumers with information and incentives to choose lower-cost providers may help mitigate the price effects of consolidation. To this end, employers and health plans have increasingly offered enrollees access to cost transparency tools and benefit designs that include tiered copayments, reference pricing, and incentives to seek care at centers of excellence. Such 'steering' mechanisms have been shown to lower costs and put downward pressure on prices." Yet, those specific tools the study identified as important to maintaining competition are precisely the tools that NYP has suppressed through the vertical restraints it has forced on Network Vendors and Payors, including but not limited to the All Products restriction.

76.     In addition, there is a growing recognition by lawmakers that anti-steering provisions are anticompetitive, as evidenced by recently enacted state statutes in Massachusetts, Connecticut, and Nevada (*see* Mass. Gen. Laws Ch. 176O, § 9A (Massachusetts); C.G.S.A. § 38a-477i (Connecticut); and N.R.S. § 598A.440 (Nevada)). In addition, in 2022, New York passed the Hospital Equity and Affordability Law, known as the "HEAL Act," which prohibits

providers from using gag clauses to hide the prices they charge from payors themselves or to forbid payors from revealing those prices publicly. N.Y. Ins. Law § 3217(o)(1)(B).

## V.     ANTICOMPETITIVE CONDUCT

77.     NYP has engaged in some of the most flagrantly anticompetitive contracting and negotiating tactics of any hospital system in America. NYP imposes anticompetitive terms on Network Vendors that limit Network Vendors' ability to build high-value networks based on price or quality, that restrict or block Payors from steering members to the highest value care, that prevent Payors from offering cost-effective options to their members, and that prevent individuals from knowing the price of care before they receive it.

78.     Through the All Products restraint and other related restrictions, NYP frustrates selective contracting by restricting the ability to exclude NYP facilities. Illustrating how NYP insists upon this treatment, NYP told a Network Vendor that had attempted to exclude it from a network that NYP "expect[s] to be in every network offered."

79.     The All Products restraint also frustrates selective contracting, specifically steering, because the restraint dictates how NYP's facilities are tiered or otherwise preferenced (or de-preferenced) within a network. NYP requires that, within every network, the Network Vendor feature all of NYP's facilities at the most favored level or "tier" of benefits in each health plan, regardless of how NYP's prices compare to its competitors in the same tier.

80.     NYP imposes and enforces these restraints on all or nearly all Network Vendors that design health plans that Payors offer to their members in the relevant geographic markets.

81.     The All Products restraint and NYP's other contractual restrictions prevent or impede Payors from incentivizing members to seek care at lower-priced competitors of NYP. Specifically, they prohibit Network Vendors from creating (and Payors from implementing): narrow networks or other plans that exclude (or at least could threaten to exclude) some or all

NYP providers; tiered networks in which NYP, or even a subset of NYP facilities, are not in the top tier; and programs that seek to lower Payors' costs by sharing truthful pricing information with members.

82. NYP has restricted or prohibited these cost-saving measures through express contract provisions, negotiating tactics, and threats. Network Vendors and Payors do not want to accept these restraints but, with rare exception, have no practical alternative because of NYP's market power. Thus, rather than compete to earn the opportunity to be in Payors' networks and better tiers through lower prices or better value, NYP relies on its market power to ensure its participation through these contractual restrictions.

83. In its Answer to the DOJ Complaint, NYP asserts that it "has often agreed to modify, limit, or delete the All Products provision to accommodate insurer network designs." Yet none of NYP's purported modifications has enabled Payors to steer patients toward lower-cost providers and away from NYP's high-priced services. And NYP's default position in negotiations with Network Vendors is to insist on the All Products provision. Thus, the All Products provision continues to impede Payors' ability to offer cost-effective alternatives to their members and insulates NYP from meaningful price competition.

84. NYP's restrictions consistently create disincentives and deter Network Vendors and Payors from steering patients to lower-cost or higher-value providers, and from providing patients with full information about their healthcare options, including price and cost comparisons across providers.

85. In other words, NYP's plan restrictions deter the Payors that account for a dominant majority of commercial health insurance business in New York City from introducing cost-effective plans that exclude or charge more for access to NYP's hospitals through selective

contracting. Network Vendors that serve New York City and the relevant geographic markets design and offer to Payors cost-effective plans in other parts of the United States. These Network Vendors want to provide cost-effective plans in the Relevant Geographic Markets (as defined below) but are restricted or prevented from doing so by NYP's restraints. For example, a Network Vendor repeatedly reported to NYP that it needed "to offer a low-cost insurance option in the NY market," but NYP's unlawful plan restrictions prohibited the Network Vendor from creating a low-cost product. Similarly, Payors have frequently sought to change their plan designs to favor less expensive providers, only to be told by NYP that they were not permitted to do so.

86.     32BJ SEIU is one of New York's largest unions, and a self-funded payor that funds a health plan covering about 200,000 lives. After analyzing its claims data, 32BJ determined that NYP was charging, on average, 358 percent more than Medicare, which was significantly more than competing hospitals were charging for the same care. For example, 32BJ's data showed that NYP charged approximately $41,000 for caesarean-section deliveries, compared with $30,000 at Mount Sinai Health System and less than $18,000 at city hospitals. In light of this data, 32BJ designed an innovative maternity care program through which it would steer members in need of maternity services away from NYP and toward hospitals with which it was able to negotiate reasonable prices. However, NYP was able to force 32BJ to stop steering members away from NYP because of an anti-steering restriction it imposed on Anthem, 32BJ's Network Vendor at the time. Specifically, NYP told 32BJ that if 32BJ wanted to continue operating its program, NYP would need to be included as a preferred provider, even though including NYP as a preferred provider would make no economic sense for 32BJ and would undermine the program's purpose and effectiveness. 32BJ's effort to find alternative networks

29

resulted in them learning that all or nearly all Network Vendors in New York City were subject to NYP's anti-steering contractual restrictions. And, according to the Wall Street Journal, after 32BJ worked for months to find a Network Vendor that would design a bespoke network that excluded NYP, 32BJ learned that the union fund would have to pay the powerful New York-Presbyterian system $25 million—to stay out of its plan. Absent the $25 million payment from 32BJ to NYP, Aetna (32BJ's Network Vendor at this later time) couldn't offer the plan the union fund wanted.

87. An analysis of tiered health plans offered by major Network Vendors in New York City reflects NYP's use of restrictions on selective contracting. For example, in plans offered by Aetna, NYP is in the top tier despite being much higher-priced than the other in-network providers, including providers in less-preferred tiers. Including NYP's high-priced services in a health plan's top tier of providers makes no economic sense and can be explained only by the anti-steering restrictions like the All Products provision that prohibit Network Vendors from placing NYP anywhere other than the top tier. Similarly, in plans offered by United HealthCare, NYP is in the top tier despite being much higher-priced than the other in-network providers within the same tier. NYP's limitations on tiering are manifested in the distortion of tiered plans offered by Network Vendors in New York City.

88. Cigna (a major Network Vendor) and Northwell Health (a major hospital system with substantially lower prices than NYP and generally the same or higher quality and safety ratings) attempted to develop an insurance network that would exclude NYP and thereby enable Cigna to offer a lower-cost product for employers. However, as the Wall Street Journal reported, NYP invoked the restrictive provisions in its contract with Cigna and blocked them from doing

so, as Cigna's contract with NYP prevented Cigna from offering *any* networks that did not include NYP.

89. Cigna's chief medical officer has stated on the record that "No hospital system should be able to exercise market power to demand contract agreements that prevent more competitively priced networks."

90. Another anticompetitive restriction that NYP imposes is the "single negotiated rate" provision. Specifically, NYP requires Network Vendors to accept the same extremely inflated rates that NYP charges at its flagship hospitals even when their members obtain care at one of NYP's lowest-rated hospitals. For example, health plans pay the same dramatically supracompetitive price of $120,938 for a spinal fusion (a complex procedure where safety is particularly important) at both an NYP hospital that is ranked above-average in safety and an NYP hospital that is ranked well below-average in safety. By comparison, a spinal fusion at the internationally renowned Hospital for Special Surgery, which is ranked higher in quality for orthopedic procedures than NYP, is 30% cheaper, or $83,328. Given the variation among NYP facilities in location, proximity to competitors, quality, ratings, and other factors that would normally affect negotiated rates, Network Vendors would prefer to negotiate separately for each facility.

91. NYP's insistence on using a single negotiated rate for a given network and service across multiple facilities applies to NYP/Weill Cornell Medical Center, NYP Allen Hospital, NYP Hospital/Columbia University Irving Medical Center, NYP Westchester, NYP Lower Manhattan Hospital, NYP Brooklyn Methodist Hospital, and NYP Westchester Behavioral. NYP refuses to negotiate different rates across these combined facilities regardless of their location, proximity to competitors, quality, ratings, or other factors that would normally affect negotiated

31

rates for each facility. This is reflected in the pricing data NYP recently began publishing on its website to comply with federal price transparency laws. While other hospital systems publish separate data files for each of their facilities (which reflect the differing rates across those facilities), NYP publishes only one combined data file for NYP/Weill Cornell Medical Center, NYP Allen Hospital, NYP Hospital/Columbia University Irving Medical Center, NYP Westchester, NYP Lower Manhattan Hospital, NYP Brooklyn Methodist Hospital, and NYP Westchester Behavioral. That combined data file does not differentiate among those different hospitals in any way and instead reports a single negotiated rate for each insurance plan and service.

92. NYP's insistence on using a single negotiated rate for a given insurance plan and service across multiple facilities is also reflected in the American Hospital Directory's financial data reports for NYP, which state that "Data for [New York Presbyterian/Weill Cornell Medical Center] includes information for New York Presbyterian/Columbia University Irving Medical Center, NewYork-Presbyterian Lower Manhattan Hospital[], NewYork-Presbyterian Westchester[], NewYork-Presbyterian Allen Hospital, NewYork-Presbyterian Brooklyn Methodist Hospital[], NewYork-Presbyterian Morgan Stanley Children's Hospital, NewYork-Presbyterian Westchester Behavioral Health Center."

93. NYP also imposes "gag clauses" that prevent Network Vendors and Payors from telling patients the price of care at NYP before they receive it. The Wall Street Journal identified NYP as a hospital system that insists on contract clauses preventing patients from seeing a hospital's prices by allowing a hospital operator to block the information from online shopping tools that insurers offer. By preventing patients from even knowing the cost of care at NYP, these restrictions directly suppressed price competition.

94. In properly functioning markets, pricing information is freely available, allowing purchasers to know the prices they will be obligated to pay their suppliers if they purchase the suppliers' products and services. The ability to determine the amount of the purchase price before the purchase decision is made allows the customer to compare the prices offered by various competitors and allows the purchase decision to be influenced by price competition.

95. Because NYP's gag clauses prevented Payors' members from knowing in advance what their cost-sharing responsibility would be for NYP for healthcare services (and how much those prices exceed what they would have been charged by NYP's nearby competitors), NYP faced less competitive pressure to moderate its inflated pricing.

96. NYP's gag clauses also prohibit Network Vendors from telling Payors about NYP's onerous anti-steering and "all-or-nothing" restrictions, such as the All Products provision. This forces Network Vendors to conceal the anticompetitive terms of the agreements from most of the entities that are illegally harmed by them—the self-funded payors that bear the cost of NYP's supracompetitive prices. NYP tells Network Vendors that if a Payor tries to use steering, the Network Vendor must terminate the contract but may not explain why steering is not allowed. For example, when a union-sponsored Payor tried to use steering, its Network Vendor told it that if it continued to do so, it would no longer be allowed to access the network, but it could not tell the union why.

97. NYP's use of the All Products provision, other anti-steering and all-or-nothing restraints, and gag clauses effectively undermined price competition for healthcare in the relevant geographic markets. These restraints also substantially reduced NYP's rivals' incentives to compete on price because a rival providing lower prices could not use those lower prices to

33

attract consumers given that Payors could not exclude any NYP providers from their networks or even place them in a lower tier.

## VI. ANTICOMPETITIVE EFFECTS

### A. NYP's Prices Drive Up Costs for Payors

98. Prices set by hospital systems like NYP are the primary driver of cost for Payors. NYP's anticompetitive conduct allows it to set supracompetitive prices that Payors must pay. Payors like Plaintiffs have made millions of dollars in purchases for NYP's services at the supracompetitive price levels that NYP's unlawful conduct allowed it to charge.

99. A report published by The National Academy of Sciences concluded that, "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of healthcare services." The report further cited a Harvard study which found that "70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers…."

100. NYP's anticompetitive conduct facilitates the supracompetitive prices it bills to Payors. When vertical restraints like those NYP has forced on Network Vendors and Payors lead to higher prices and lower quality, that is direct evidence that the restraints are anticompetitive.

101. NYP recognizes that its plan restrictions protect its high prices. NYP's most senior contracting executive took credit for protecting NYP's plan restrictions and prices. He acknowledged: "Notwithstanding national and local trends to the contrary, [NYP] retained the Hospitals' … terms and conditions that protect against administrative erosion of rates of payment or steerage away from the Hospitals."

102. In a disclosure to bondholders, NYP recognized the risk that, if its anticompetitive restraints were removed, the increased competition that would result would eat into its margins,

noting that "[i]nsurers may further encourage competition among hospitals and providers on the basis of price, payment terms and quality" and that doing so "may lead to increased competition among hospitals based on price where insurance companies attempt to steer patients to the hospitals that have the most favorable contracts."

103. NYP has admitted that the mere risk that Network Vendors and Payors might implement steering in the future could increase competition and reduce prices in its market. In a 2023 bond offering memorandum for the issuance of $300 million of bonds, NYP noted that steering would be a risk to NYP's financial standing: "Payors have used the threat of patient steerage [in other markets] ... to drive provider prices lower."

104. NYP further recognizes that protecting its high prices through its plan restrictions benefits its bottom line because patients would often seek care elsewhere if Payors had the option of offering their members a choice of cost-effective plans. For example, NYP calculated the financial impact to NYP if Network Vendors, Payors, and patients were able to enjoy the benefits of cost-effective plan designs. According to this analysis, the introduction of tiered plans alone would reduce profits by hundreds of millions of dollars, and other forms of steering would also cause that same outcome for NYP. Similarly, NYP recognized that efforts by Network Vendors and Payors to incentivize patients to use providers who offer better value "could impact margins, particularly for standardized procedures."

**B.    NYP Charges Supracompetitive Prices Throughout the Relevant Geographic Markets and the State of New York.**

105. NYP's prices throughout the relevant geographic markets are higher than the prices it could charge in a competitive market, and are higher than the prices it could charge if it did not impose the anticompetitive restraints alleged here.

106. NYP is by far the most expensive hospital system in New York City and the relevant geographic markets, charging supracompetitive prices for inpatient GAC hospital services and other healthcare services, thus significantly driving up the cost of healthcare for Payors, including Plaintiffs and members of the Class.

107. When comparing prices across hospitals for inpatient GAC hospital services, academic literature compares "standardized prices," which represent the average allowed amount per standardized units of service.

108. In the following allegations presenting pricing data, "NYP" and "New York Presbyterian Hospital" refer to the group of hospitals listed above for which NYP reports a single negotiated rate for each insurance plan and service.

109. The standardized price per inpatient stay at NYP is more than 35% more expensive than the standardized price per inpatient stay at NYU Langone—a hospital ranked higher in quality and with a strong reputation as evidenced by its overall higher U.S. News and World Report ("U.S. News") rankings across facilities, its higher safety ratings on the consumer-focused Leapfrog rankings, and its higher ratings on consumer review websites. Charging customers approximately 35% more than a nearby and higher-rated competitor would not be possible in a functioning, competitive market, and is instead attributable to NYP's anticompetitive restraints, including but not limited to the All Products restraint. More broadly, the standardized price per inpatient stay at NYP is approximately 74% more expensive than the average standardized price per inpatient stay at major non-NYP New York City hospitals.



Standardized Price per Inpatient Stay for Major New York Hospitals

110. NYP is even more expensive than the hospitals outside of New York that are consistently ranked as the best in the United States and the world. The Mayo Clinic is consistently ranked as the best hospital in the United States and the world. The standardized price per inpatient stay at NYP is approximately 56% more expensive than the standardized price per inpatient stay at the Mayo Clinic. Cleveland Clinic is consistently ranked as the second-best hospital in the United States and the world. The standardized price per inpatient stay at NYP is more than twice as much as—approximately 111% more expensive than—the standardized price per inpatient stay at Cleveland Clinic. UCLA Medical Center is consistently ranked as the third best hospital in the United States and one of the best hospitals in the world. The standardized price per inpatient stay at NYP is approximately 43% more expensive than the standardized price per inpatient stay at UCLA Medical Center. Massachusetts General Hospital is consistently ranked as one of the best hospitals in the United States and the world. The standardized price per inpatient stay at NYP is approximately 43% more expensive than the standardized price per inpatient stay at UCLA Medical Center. Massachusetts General Hospital is consistently ranked as one of the best hospitals in the United States and the world. The standardized price per

37

inpatient stay at NYP is more than twice as much as—approximately 102% more expensive than—the standardized price per inpatient stay at Massachusetts General Hospital.

111. The same discrepancies exist within specific inpatient service lines. The following examples are illustrative and representative, using service lines as defined by the highly respected, independent RAND Corporation.

112. The standardized price per inpatient stay in Orthopedics at NYP is $67,631, compared with $56,596 at NYU Langone, which is ranked higher than NYP in Orthopedics quality by U.S. News, and is substantially higher than at other major hospitals in New York City.



113. The standardized price per inpatient stay in Childbirth at NYP is $60,235, which is between 26% and 67% higher than the standardized price per inpatient stay at other major hospitals in New York City.



## Standardized Price for Inpatient Stays, Childbirth



114.     The standardized price per inpatient stay in Circulatory System at NYP is $56,511, which is between 14% and 59% higher than other major hospitals in New York City, including NYU Langone and Mt. Sinai, which are both ranked higher than NYP in Cardiology quality by U.S. News.



Standardized Price for Inpatient Stays, Circulatory System

115. The standardized price per inpatient stay in Respiratory System at NYP is $75,999, which is between 49% and 117% higher than other major hospitals in New York City, including NYU Langone, which is ranked higher than NYP in Pulmonology quality by U.S. News.



## Standardized Price for Inpatient Stays, Respiratory System



116. Similar differences exist when comparing prices for specific procedures. When evaluating prices for specific procedures, academic literature suggests comparing "generally homogenous" procedures—*i.e.*, those that generally have little to no variation on quality or cost and occur with sufficient frequency to support empirical analysis. In a competitive market, the price for generally homogenous procedures would not substantially vary from facility to facility. The following examples are illustrative and representative.

117. A joint replacement is considered a generally homogenous procedure because it is one of the most common inpatient surgeries with little quality variance among New York City hospitals. NYP performs thousands of joint replacements each year, and its price for a joint replacement is $92,485. NYU Langone charges only $55,029, and the Hospital for Special Surgery—a hospital that specializes in orthopedic surgeries like joint replacement, and that is consistently ranked the top orthopedic hospital in the nation as well as number one in the world

in multinational surveys and provides higher quality orthopedic services than NYP—charges only $74,118.



Joint Replacement Commercial Rates

118.    A spinal fusion (cervical) is another very common inpatient surgery. Yet, NYP's price for a spinal fusion is $120,938, compared to $83,328 at the Hospital for Special Surgery and $79,022 at NYU Langone.

42



**Spinal Fusion Commercial Rates**

119.     A Caesarean Section is another common inpatient surgery. Yet, NYP's price for a C-Section is $42,023, compared to $29,629 at NYU Langone and $29,155 at Mt. Sinai Hospital.



**C-Section Commercial Rates**

120.     A Coronary Bypass is another common inpatient surgery. NYP's price is $198,625, compared to $137,260 at NYU Langone and $134,160 at Mt. Sinai Hospital.



121.     These price differences between NYP and its closest, high-quality competitors for these procedures—many of which are considered to be generally homogenous and therefore unlikely to vary on quality across systems—are demonstrative of NYP's significantly higher average overall price across all inpatient hospital services.

122.     These numbers are not cherry-picked: Similar results are demonstrated when comparing systemwide pricing across all inpatient GAC hospital services, by procedure. One standard billing unit of prices for inpatient procedures is Diagnostic-Related Group ("DRG") codes, which are codes hospitals submit to payers for procedures or inpatient stays and which, for each Network Vendor, are associated with a price. DRG codes account for surgical complications and comorbidities, meaning they can be used for direct price comparisons as they adjust for patient acuity. Using publicly available commercial prices posted by each hospital and

44

comparing all publicly available DRGs (736 out of approximately 760 total DRGs or 97% of all DRGs), NYP charges, on average, 66% more than NYU Langone.

123. Across all clinical categories and payers, NYP commands a median rate premium of 59% over Mount Sinai, and for a quarter of all comparable procedures, that premium exceeds 92%. This means that for a full quarter of all comparable billing codes, NYP is reimbursed at nearly double Mount Sinai's rates. At the procedure level, the premium against Mount Sinai runs across every major clinical category:

- C-Section: +133%
- Vaginal Delivery: +116%
- Heart Failure: +90%
- Pneumonia: +82%
- Acute Myocardial Infarction: +84%
- Cardiac Catheterization/PCI: +62%
- Bariatric Surgery: +62%
- Major Bowel Procedures: +66%
- Sepsis: +55%
- Spinal Fusion: +50%
- Cardiac Surgery (valve, CABG, etc.): +48%
- Hip/Knee Replacement: +48%
- Craniotomy: +45%

124. NYP would not be able to consistently charge prices 50% higher than these two nearby, high-quality competitors absent the anticompetitive restraints at issue in this case. Were NYP at risk of being fully or partially excluded from healthcare networks, or of being steered

away from or placed in a tier below a plan's top tier, it would not be able to maintain such supracompetitive pricing.

125. NYP is able to charge these supracompetitive prices despite not offering inpatient hospital services of markedly better quality than other providers. In 2022, hospital safety grades compiled by The Leapfrog Group, an independent nonprofit with grades pulled from a variety of data sources, and described as "the gold standard measure of patient safety," gave all of NYP's facilities, including its flagship facility at Weill Cornell, "C" grades for patient safety. One NYP facility, Brooklyn Methodist, received a score that ranked it among the worst nationally in hand-washing, a basic and essential aspect of patient safety.

126. NYP did not fare much better in 2023, with four NYP facilities receiving "C" grades, and only two receiving "B" grades. NYP's continued growth in profitability during its periods of lower quality care indicates that the reason for its continued growth is not superior quality, but NYP's market power and anticompetitive conduct. Although NYP's facilities received "A" grades from Leapfrog in 2024, the high profitability in the earlier years indicates that NYP was able to charge supracompetitive prices regardless of the quality of its care.

127. NYP's inpatient prices relative to other providers result from NYP's abuse of its market power to impose restraints such as the All Products provision that limit price competition between hospitals in the relevant geographic markets (defined below). Without the vertical restraints that NYP uses to leverage its market power systemwide, NYP would not be able to maintain these supracompetitive inpatient prices. If Network Vendors and Payors could use steering or invoke the threat of steering in their negotiations with NYP, it would not be profitable or sustainable for NYP to maintain its high inpatient prices.

46

128. The above-described price differentials cannot be explained solely by NYP's market power and are partly or entirely attributable to the anticompetitive restrictions NYP imposes on Network Vendors and Payors.

129. The above-described price differentials between NYP and its competitors are especially telling because NYP's anticompetitive contracting practices reduce incentives for competing hospitals to lower their own prices. In an unrestrained market, NYP's competitors would be incentivized to lower their prices in exchange for Network Vendors and Payors steering toward them. Because NYP's restraints prohibit steering away from NYP, however, competing hospitals have had less incentive to lower their own prices because doing so is less likely to deliver them higher patient volume. This has resulted in Payors, including Plaintiffs, being harmed by the "umbrella effects" of NYP's anticompetitive conduct—*i.e.*, paying more for services at non-NYP hospitals than they would pay in the absence of NYP's restraints.

## VII. RELEVANT MARKETS

130. Judgment may be entered against NYP for the illegal conduct described in this complaint without precisely defining the particular markets that NYP's conduct has harmed or demonstrating NYP's market power in those markets. NYP's ability to persistently charge supracompetitive prices throughout New York City is direct evidence of NYP's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares. Likewise, NYP's ability to impose anticompetitive restraints in all, or nearly all, of its negotiations and/or agreements with Network Vendors and Payors— and to limit the ability of its competitor-hospitals to work with Network Vendors and Payors to create tiered and narrow networks—is direct evidence of NYP's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares.

47

131. Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein.

### A. Relevant Product Market

132. A relevant product market in this action is the market for acute inpatient hospital services, referred to as inpatient general acute care ("inpatient GAC") hospital services (the "Relevant Product Market"). This market for inpatient GAC hospital services includes the sale of such services to individual, group, fully insured, and self-funded health plan sponsors such as Plaintiffs. NYP sells these services at each of its facilities, although not every facility offers the exact same cluster of services.

133. Inpatient GAC hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual inpatient GAC hospital services are not substitutes for each other (e.g., orthopedic surgery is not a substitute for gastroenterology), Network Vendors typically contract for inpatient GAC hospital services as a cluster in a single negotiation with a hospital, the services are sold under similar competitive conditions, and NYP's contractual restrictions have an adverse impact on the sale of all inpatient GAC hospital services. Therefore, individual inpatient GAC hospital services can be analyzed together.

134. Moreover, non-hospital facilities, such as independent outpatient facilities, specialty facilities (e.g., nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services do not offer services that are viable substitutes for inpatient GAC hospital services. Demand for inpatient GAC hospital services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. Thus, inpatient GAC hospital services can be treated analytically as a single product market. Inpatient GAC hospital services have been accepted as a relevant product market by

many courts in antitrust actions brought by the Federal Trade Commission, U.S. Department of Justice, and by private antitrust plaintiffs.

135. The market for inpatient GAC hospital services has extremely high barriers to entry relative to other product markets. These barriers to entry include, but are not limited to: the need to spend significant money to build expensive facilities; the difficulty of hiring skilled staff (such as surgeons and anesthesiologists with specialized licenses to practice in the specific geography); extremely onerous regulatory hurdles for opening a new hospital, such as obtaining approval from state and local officials; the limited availability of real estate available to build new hospitals in New York City; and the many years required to build a new hospital.

136. The Relevant Product Market does not include sales of inpatient GAC hospital services to government Payors, e.g., Medicare, Medicaid, and TRICARE (covering military families), because healthcare providers' negotiations with commercial Network Vendors are separate from the process used to determine the rates paid by government Payors.

137. There are no reasonable substitutes or alternatives to inpatient GAC hospital services. Consequently, a hypothetical monopolist of inpatient GAC hospital services sold to Payors likely would undertake at least a small but significant and non-transitory price increase or other worsening of terms for those services over a sustained period of time. Indeed, NYP has in fact imposed such price increases for inpatient GAC services in New York City while increasing its profitability and without fear of losing patient volume.

## B. Relevant Geographic Market

138. Defining relevant geographic markets helps courts assess, among other things, the geographic area in which NYP wields market power and the anticompetitive impact of the challenged restraints. The relevant geographic market is no larger than the five boroughs of New York City.

139. The borough of Manhattan is a relevant geographic market. Manhattan is a geographic market in which market power in the sale of inpatient GAC hospital services can be exercised. It satisfies the hypothetical monopolist test. A hypothetical monopolist consisting of all hospitals in Manhattan likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms over a sustained period of time for at least one hospital, without fear of losing patient volume. Indeed, NYP has in fact imposed such price increases for inpatient GAC services in Manhattan while increasing its profitability.

140. Many patients who seek healthcare in New York City prefer to receive inpatient GAC hospital services at the well-regarded hospitals in Manhattan. Because of this, a Network Vendor that only offered Payors access to networks that did not have any in-network hospitals located in Manhattan would not be competitive in selling health plans to many employers and individuals in New York City, including those in Manhattan. To continue selling commercial health plans to Payors and individuals in New York City, Network Vendors would be forced to accept a price increase imposed by the hypothetical monopolist.

141. The area comprising the boroughs of the Bronx, Brooklyn, Manhattan, and Queens is also a relevant geographic market (the "Four-Borough Market") in which market power in the sale of inpatient GAC hospital services can be exercised.

142. The Four-Borough Market excludes Staten Island. Few patients using hospitals in the Four-Borough Market consider hospitals located on Staten Island to be a close substitute to hospitals in the Four-Borough Market.

143. The Four-Borough Market satisfies the hypothetical monopolist test. A hypothetical monopolist that consists of all hospitals in the Four-Borough Market likely would undertake at least a small but significant and non-transitory increase in price or other worsening

of terms over a sustained period of time for at least one hospital, without fear of losing patient volume. Indeed, NYP has in fact imposed such price increases for inpatient GAC services in the Four-Borough Market while increasing its profitability.

144. Patients who seek healthcare in the Four-Borough Market prefer to receive inpatient GAC hospital services at the well-regarded hospitals in the Four-Borough Market and at hospitals that are close to where they live and work. Because of this, a Network Vendor that only offered Payors access to networks that did not have any in-network hospitals located in the Four-Borough Market would not be competitive selling health insurance products to many employers and individuals in New York City. To continue selling health plans to Payors and to individuals in New York City, Network Vendors would be forced to accept a price increase imposed by the hypothetical monopolist.

145. Patients generally seek inpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges. As stated in an FTC study, "In healthcare markets, distance to medical provider is one of the most important predictors of provider choice." Courts have likewise recognized that "people want to be hospitalized near their families and homes, in hospitals in which their own—local—doctors have hospital privileges." Given this, patients do not typically regard hospitals that require significant travel time as substitutes for local ones, particularly when they have little or no financial incentive to travel greater distances. Consequently, an insurance network that does not satisfy patient demand for access to conveniently located hospitals will not be commercially viable.

146. Network Vendors who seek to assemble networks for Payors located in the relevant geographic markets or with employees in the relevant geographic markets must include inpatient GAC hospital services from hospitals within the relevant geographic markets in their

networks. This is because people who live and work in the relevant geographic markets strongly prefer to obtain inpatient GAC hospital services within the relevant geographic markets, and it could be medically inappropriate and infeasible to require them to travel farther. Payors whose members live in the relevant geographic markets have little or no willingness to select a Network Vendor whose networks provide no in-network access to inpatient GAC hospital services located in the relevant geographic markets. Moreover, New York state network adequacy regulations require health plans operating in New York City to offer in-network access to multiple hospitals in New York City and to "contain a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will be accessible without undue delay. This includes being geographically accessible[.]"

147. Payors offering health plans covering members who live or work in the relevant geographic markets do not regard hospitals offering inpatient GAC services outside of the relevant geographic markets as reasonable alternatives for hospitals offering inpatient GAC services within the relevant geographic markets. Accordingly, Network Vendors seeking to build provider networks that would be attractive to Payors with such residents as members would not regard inpatient GAC hospital services from hospitals outside of the relevant geographic markets as reasonable alternatives for inpatient GAC hospital services from hospitals within the relevant geographic markets.

148. As the evidence below makes clear, NYP has market power in the inpatient GAC hospital services market in the relevant geographic markets despite having under 50% market share in the relevant geographic markets.

## VIII. NEW YORK PRESBYTERIAN'S MARKET POWER

149. NYP has market power in the relevant product market and in the relevant geographic markets.

150. NYP has the ability to persistently and profitably charge prices above those that would be charged in a competitive market. This is direct evidence of market power.

151. Unlike firms in a competitive market, NYP does not fear losing patients to its rivals if it charges higher prices than they do. NYP's most senior contracting executive testified that its rivals' offering of lower prices to Payors "has no relevance to me." NYP can be unconcerned about its competitors' lower prices because NYP's market power allows it to impose plan restrictions that insulate it from price competition.

152. NYP is, by far, the most expensive hospital system in New York City despite having lower quality and safety ratings than some competitors. As detailed above, NYP charges substantially higher prices than its competitors across the board, including for "generally homogenous" procedures—*i.e.*, those that generally have little to no variation on quality or cost and occur with sufficient frequency to support empirical analysis—and for procedures in service lines in which its competitors have higher ratings for quality and safety. In a competitive market, the price for generally homogenous procedures would not vary as substantially from provider to provider, and NYP would not be able to persistently charge higher prices than higher-quality competitors. NYP's ability to persistently and profitably charge supracompetitive prices for these procedures, and across all procedures more broadly, is direct evidence of its market power.

153. NYP is in-network for all significant Network Vendors and, on information and belief, is in-network for over 95% of Payors in the relevant geographic markets. The fact that NYP is virtually always in-network for every network a Network Vendor creates and a Payor offers to members, despite its high prices, strongly indicates that NYP possesses and exercises market power in the relevant markets. Because of NYP's size, brand, and perceived status, the many hospitals and other providers it controls, and its dominant market position in certain critical

service lines such as cardiology and obstetrics, Payors offering health plans to members in the relevant geographic markets must have NYP as a participant in at least some of the provider networks they offer to members to have successful health network products. Without NYP—a large hospital system that is well-known by generations of New Yorkers—an insurance plan would not be attractive to the employees and residents who prefer a broad network plan that covers medical care from the full range of providers. Because most employers have many employees that prefer broad networks that include NYP, Payors must offer their members at least some plans that include some or all NYP facilities and providers in-network. And because Payors must include NYP in *some* of the plans they offer to members, NYP is able to leverage this power to force Network Vendors and thereby Payors to include *all* NYP facilities and providers in *all* of their networks, at the highest benefit level or plan tier.

154. NYP understands this dynamic: It knows that almost all Payors must include NYP in at least some of the networks they offer to members, and that therefore Network Vendors must contract with NYP to successfully sell provider networks to payors. And NYP exerts this leverage in its negotiations with Network Vendors and its interactions with Payors. Network Vendors that negotiate insurance networks in the Relevant Market have tried to negotiate the removal of plan restrictions from their contracts with NYP—so that they can give Payors at least the option of offering to their members *some* plans that exclude some or all NYP facilities and providers—but NYP has summarily refused.

155. NYP's ability to impose these anti-steering and all-or-nothing restraints on Network Vendors and Payors independently evidences NYP's market power. Because insurance companies, when acting as Payors responsible for insuring fully insured plans, must pay NYP's overcharges, NYP's anti-steering provisions are not in the insurance companies' interest. But

because of NYP's market power, the insurance companies must accede to NYP's demands when they act as Network Vendors negotiating the prices and composition of networks used by fully insured and self-funded plans.

156. NYP's extraordinarily high prices would ordinarily entail being excluded from some networks in the relevant product and geographic markets; the fact that this is rare is strong evidence that NYP has market power and Network Vendors and Payors lack the ability to exclude it.

157. NYP's operating profit per discharge has been consistently high in every year that data is available since at least 2011, with the exception of 2020 (the peak of the COVID-19 pandemic in New York). These high and stable margins are direct evidence of NYP's market power.



158. A March 21, 2025, review by the New York City Department of Health and Mental Hygiene examining 2023 insurer fee-for-service payments for covered medical services

found that NYP had the highest overall facility expenditure per inpatient admission, at $92,727. In addition, NYP had the highest prices for 11 of 12 inpatient procedures analyzed.

159. NYP imposes anticompetitive contractual terms, including the All Products restriction and other anti-steering restraints, on most or all Network Vendors and Payors operating in New York City and the relevant markets, including the largest Network Vendors. NYP is able to do so even though Network Vendors and Payors do not want to accept these anticompetitive restraints and want to be able to reduce costs by steering, tiering, and/or creating narrow networks. NYP's ability to impose the All Products restrictions and other restraints on Network Vendors and Payors, and the fact that those restraints are rarely violated, is evidence of market power. If a hospital system without market power attempted to force these restraints onto Network Vendors and Payors, the Network Vendors and Payors would refuse to accept those restraints, and would refuse to include that system in some or all of their networks or, at a minimum, would include that system only if it lowered its prices below the prices that NYP charges to be more in line with the rest of the providers it competes with.

160. NYP's ability to demand a single negotiated rate for a given insurance plan across multiple hospitals—despite significant differences across the hospitals in terms of the set of services offered, geographic locations, and quality—is consistent with NYP dictating or setting prices rather than prices being determined as the outcome of a competitive process involving multiple rivals competing for network inclusion over price and non-price terms. Setting prices at a high level, insisting on all-or-nothing contracting, and achieving near universal network inclusion, are all evidence that NYP has market power.

161. NYP's market power is sustainable (and unlikely to be challenged by entrants) in part because of the enormous barriers to entry for any would-be competitor in the market for

providing inpatient GAC hospital services, which include financial, legal, and regulatory hurdles to obtaining approval for and building a hospital; difficulty of attracting specialized staff in a tight labor market featuring non-compete restraints; and referral networks and medical records rules that disadvantage new entrants.

162. There is limited excess capacity in many markets for inpatient GAC hospital services, including New York City, as it is not financially viable for hospitals to keep a large percentage of their beds empty for significant portions of the year. Demand for inpatient GAC hospital services, however, spikes at various times because of external events (seasonal disorders, disease outbreaks, natural disasters, new substance abuse trends, etc.). To ensure that plan members will have in-network access to at least one provider of inpatient GAC hospital services in the relevant geographic markets even during one of these spikes, Network Vendors in these geographic markets typically must include multiple hospitals in their networks, comprising the majority of all inpatient beds. This dynamic makes it extremely difficult for Network Vendors to entirely exclude from all of their networks large hospital systems like NYP that own or control a significant percentage of the inpatient beds in a geographic market.

163. Because of NYP's size, number of facilities, the comprehensiveness of its offerings, and the dynamics outlined above, Network Vendors generally cannot build commercially viable networks that Payors would accept that do not include at least some NYP facilities. And because, as outlined above, NYP uses "all or nothing" contracting and imposes the "All Products" restriction, Network Vendors and payors generally must include *all* of NYP's facilities in *all* their networks, including facilities they would not include on their own merits— and are effectively prohibited from steering patients away from them.

164. NYP's market power is also clear from a recent dispute between Mt. Sinai Hospital and United HealthCare, which is one of the largest Network Vendors in New York. During price negotiations in 2024, Mt. Sinai proposed raising its prices by 43% over the next three years. United HealthCare refused to agree to those prices and dropped Mt. Sinai from its network, announcing that "all Mount Sinai hospitals are out of network for employer-sponsored and individual plans … as of March 1 following Mount Sinai's refusal to move off its demands for egregious price hikes." Even with the proposed price increases that United HealthCare described as "egregious," Mt. Sinai's prices for inpatient GAC hospital services would still have been substantially lower than NYP's prices. Indeed, Mount Sinai commented during the dispute that "it is just trying to get paid rates that are closer to competitors like New York-Presbyterian." The fact that United HealthCare was willing and able to drop Mt. Sinai from its network but has not dropped NYP from its network despite NYP's even higher prices, is evidence of NYP's market power, particularly since NYP is not a higher-quality hospital system than Mt. Sinai. Mt. Sinai and United Healthcare later reached an agreement, presumably for lower rates than Mt. Sinai proposed.

165. NYP's size gives it substantial market power. NYP is, in its own words, "one of the nation's most comprehensive, integrated academic healthcare systems, encompassing hospital campuses, primary and specialty care clinics and medical groups, and an array of telemedicine services ... [w]ith more than 450 locations in Manhattan, Queens, Brooklyn, Westchester, and Putnam Counties." NYP's capacity is massive, encompassing hospital campuses, primary and specialty care clinics and medical groups, plus an array of telemedicine services. NYP provides a wide range of services, including inpatient, ambulatory, and preventive care in all, or substantially all, areas of medicine. NYP's hospital network has over 4,000 beds,

more than 10,000 affiliated physicians, and sees more than 2 million visits annually, including more than 620,000 emergency department visits. According to the Department of Justice, in 2024, NYP's share of inpatient GAC hospital discharges was more than 30 percent in Manhattan and more than 25 percent in the Four-Borough Market.

166. NYP's flagship hospital, NewYork-Presbyterian/Weill Cornell Medical Center, is a powerhouse on its own. According to public sources, this hospital alone has the highest number of discharges, and the highest net patient revenue, throughout the entire New York City metropolitan area.

167. NYP also has market power because of its perceived status among certain segments of consumers in New York City. Specifically, many executives and other individuals employed in high-ranking positions have a strong preference for receiving care at NYP, in large part because of the perceived reputational and social benefits associated with receiving care at NYP. NYP provides special services specifically to wealthy executives and other high-income individuals. For example, it has an "elite" wing of the hospital catering to wealthy patients that offers luxury amenities not available to ordinary New Yorkers and not available at many other New York City hospitals.

168. Because a substantial number of these high-ranking, influential employees demand that their employers provide in-network access to at least some of NYP's facilities, and because ERISA generally prohibits self-funded health plans from offering different benefits to high-ranking employees compared to rank-and-file employees, Network Vendors' networks will not be commercially viable in New York City if they do not include in-network access to at least some of NYP's facilities.

169. NYP uses its resulting market power to impose anticompetitive restraints on Network Vendors and Payors, including the All Products restriction and other anti-steering restraints. Those restraints enable NYP to demand prices higher than it otherwise could and to obtain patient volume greater than it otherwise would absent those restraints. For example, without NYP's All Products restriction and other restraints—*i.e.*, if Network Vendors and Payors were able to engage in selective contracting such as steering—many patients who would otherwise choose NYP (because of its location, perceived status, or any other factor) would instead choose a lower-priced competitor, which would both reduce costs for those patients' health plans and place competitive pressure on NYP to lower its prices. By using its market power to restrict or block steering and other cost-effective plan designs (e.g., the creation of narrow networks), NYP thwarts that price competition and interferes with free competition.

170. NYP also gains market power from its importance in geographic areas of New York City which are "medically underserved," and therefore depend on access to nearby NYP hospitals. One of the areas considered medically underserved is "Lower Manhattan," defined herein as the area of Manhattan below 14th Street. NYP owns NewYork-Presbyterian Lower Manhattan Hospital which is located in Lower Manhattan near the Financial District. The U.S. Health Resources and Services Administration calculates an Index of Medical Underservice ("IMU") score for communities across the U.S. This IMU calculation includes the ratio of primary medical care physicians per 1,000 persons to the infant mortality rate, percentage of the population with incomes below the poverty level, and percentage of the population over the age of 64. The score is used to determine if a geographic area qualifies as a "Medically Underserved Area." According to a "Community Health Needs Assessment" released on December 31, 2023 by Verite Healthcare Consulting and Mount Sinai Beth Israel using this methodology, much of

Lower Manhattan, including neighborhoods like the Lower East Side and Chinatown, qualifies as "medically underserved."

171. In addition, according to a Health Equity Impact Assessment carried out from December 2023 to January 2024 by the Community Coalition to Save Beth Israel and New York Eye and Ear Infirmary, at that time Lower Manhattan had only .81 hospital beds per 1,000 residents below 14th Street, less than half the statewide rate of 2.4 beds per 1,000.

172. Lower Manhattan has suffered from this lack of GAC Services since at least 2008. That year, Cabrini Hospital closed, followed by St. Vincent's Hospital in 2010. In the years since, only one free-standing emergency department has opened, the Lenox Hill Greenwich Village facility. Yet this department lacks inpatient services, and a patient presenting to this facility with conditions requiring inpatient treatment often must be transferred to a full-service hospital.

173. The decrease in providers of GAC Services in Lower Manhattan has been further exacerbated by the closure of Mount Sinai Beth Israel on April 9, 2025. In a survey conducted before the hospital's closure, almost half of local respondents said they "would face a long or difficult commute to other hospitals." One of the only remaining providers of GAC Services in Lower Manhattan is NYP's facility, NewYork-Presbyterian Lower Manhattan Hospital. NYP is aware of this, reportedly "making moves to increase capacity and ease ER overcrowding" following the closure of Beth Israel. Residents of Lower Manhattan therefore will expect any commercial health plan to provide access to NYP, one of the few full-service providers of GAC Services near them.

174. Similarly, areas of Brooklyn which are in close proximity to NewYork-Presbyterian Brooklyn Methodist Hospital qualify as medically underserved, including

neighborhoods like Gowanus, Sunset Park, and Bedford-Stuyvesant. Again, the relative lack of providers of inpatient GAC Services in these areas means that residents of these areas will expect their health plan to provide them with access to NYP's Brooklyn facility.

175. NYP's market power is widely reported and recognized by industry observers, market participants, government officials, and media outlets.

176. A national media outlet has accurately referred to NYP as a "massive hospital system" and stated that NYP has "leverage over even the largest insurers" in setting prices.

177. A national media outlet has accurately stated that "New York-Presbyterian—like many other large, tax-exempt hospital systems across the country—has built a regional medical empire."

178. A New York-based media outlet has accurately described NYP as "one of the state's most influential hospital systems" in a story detailing NYP's efforts to prevent competitors from opening a nearby cardiac care facility.

179. A 2018 study funded by the New York State Health Foundation found that NYP was "the financial powerhouse of New York's health systems" and described it as having "significant economic power and ability to shape the health system."

180. A study by the New York State Health Foundation indicated that an inpatient facility in Brooklyn affiliated with NYP was able to charge significantly higher prices than nearby inpatient facilities (including more prestigious academic medical centers) because of its affiliation with the broader NYP system. NYP's ability to charge a supracompetitive price at this small facility, despite nearby competition from larger, high-quality competitors is evidence of NYP's market power.

181. In a comment to the Wall Street Journal about NYP's contract restrictions, Cigna's chief medical officer stated that "No hospital system should be able to exercise market power to demand contract agreements that prevent more competitively priced networks."

182. A former Cigna executive described NYP's market power as follows: "They're a must-have in the network, which gives them the power they want in negotiating contracts with insurers."

183. One healthcare policy expert has stated that NYP's "market power has allowed [it] to charge higher prices to insurers."

184. NYP has described itself as a "health-care powerhouse" and touted that it was the first academically affiliated hospital to achieve "total consolidation."

185. For all the reasons outlined above, NYP possesses market power, even though it has less than 50% market share in the inpatient GAC hospital services market in the relevant geographic markets. The above direct evidence of NYP's market power obviates the need to evaluate market power via market share percentages, which are an imprecise measure of market power in markets for inclusion in networks, rather than the sale of discrete, fungible objects.

186. In the lawsuit it filed after Plaintiffs filed their lawsuits, the DOJ agreed that "NYP has market power in the sale of inpatient GAC hospital services in Manhattan and in the Four-Borough Market," that "NYP's supracompetitive rates provide compelling evidence of its possession and exercise of market power," and that "[t]he fact that large payors cannot do business in Manhattan or the Four-Borough Market without contracting with NYP is also telling evidence of NYP's market power."

## IX. NO PROCOMPETITIVE BENEFIT JUSTIFIES NEW YORK PRESBYTERIAN'S ANTICOMPETITIVE CONDUCT

187. New York Presbyterian's All Products and other anti-steering provisions, single negotiated rate provisions, and gag clauses are anticompetitive and lack procompetitive justifications.

188. Defendant's market power and its profits are not the product of a superior product, business acumen, or historical accident. As detailed above, New York Presbyterian's services are not superior; in fact, the system falls short of its competitors on many metrics, including patient safety and satisfaction.

189. New York Presbyterian's market power does not stem from its offering services of higher quality, but rather from the scheme detailed above. New York Presbyterian has not made its services better, but rather worked to hamper competition.

190. Even if there were any procompetitive effects arising from New York Presbyterian's conduct (there are not), the anticompetitive effects of New York Presbyterian's conduct outweigh any such benefits. And even if any such procompetitive effects exist, they could easily be achieved via less restrictive means: namely, removal of the anti-steering provisions.

## X. CLASS ALLEGATIONS

### A. Class Definition

191. Plaintiffs define the putative class in this litigation as follows:

> All entities that purchased in-network general acute care inpatient hospital services from The New York and Presbyterian Hospital at any point during the period from four years prior to filing to the present (the "Class Period").

192. Excluded from the class are (1) natural persons, (2) entities whose only payments to Defendant were copays, coinsurance, and/or other out-of-pocket payments, or any payments

for out-of-network claims; (3) Defendant; (4) all federal governmental entities; (5) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court(s); and (6) Plaintiffs' counsel.

193. This class definition is subject to revision or amendment as the matter proceeds.

194. The class is ascertainable because it is defined to include only direct purchasers who paid at least one claim for inpatient GAC hospital services to NYP during the Class Period.

## B. Certification Requirements

195. Plaintiffs do not yet know the exact size of the class; however, based upon the nature of the industry involved, Plaintiffs expect that there are thousands of class members. Therefore, class members are so numerous that joinder is ultimately impracticable.

196. Because NYP has acted in a generally consistent manner applicable to the class writ large, questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. The common questions include, but are not limited to:

(a) The definition of the relevant product market and geographic market;

(b) Whether NYP has market power in the relevant market;

(c) Whether NYP engaged in anticompetitive conduct by imposing contractual restrictions that unreasonably restrain trade;

(d) Whether NYP's vertical restraints enable it to charge unlawful supracompetitive prices;

(e) Whether Plaintiffs and the proposed class have suffered injury caused by the alleged anticompetitive conduct;

(f) Whether NYP's conduct violates the Sherman Act and/or the Donnelly Act; and

(g) Whether and to what extent Plaintiffs and the proposed class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

197. Plaintiffs' claims are typical of the claims of the other class members. Plaintiffs and the other class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories. Because NYP imposes highly similar anticompetitive restraints on all or nearly all Network Vendors and Payors, including Plaintiffs, Plaintiffs' claims regarding the anticompetitive conduct and the harm it has caused Plaintiffs are typical of those of the class.

198. Plaintiffs will adequately represent the interests of all class members. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting antitrust and class action cases, and who have been named as lead counsel in multiple class action cases. Neither Plaintiffs nor class counsel have any interests in conflict with those of the class members.

199. This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions that affect only individual members. Individual joinder of all members of the class is impracticable and class treatment will permit a large number of similarly situated Payors to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(h) due to the complexity of issues involved in this action and the expense of litigating the claims, many class members could not afford to seek legal redress individually for the wrongs that defendants committed against them, and many

absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(i)     when NYP's liability has been adjudicated, claims of all class members can be determined by the Court;

(j)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(k)     without a class action, many class members would continue to suffer injury, and NYP's violations of law will continue without redress while NYP continues to reap and retain the substantial proceeds of their wrongful conduct; and

(l)     this action does not present any undue difficulties that would impede its management by the Court as a class action. Furthermore, the prosecution of the claims of the class in part for injunctive relief is appropriate because NYP has acted, or refused to act, on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## XI.     STANDING

200.    The Plaintiff self-funded plans are efficient enforcers of the antitrust laws.

201.    Like insurers who offer fully insured products, self-funded payors pay providers for healthcare services delivered to their members. They do not pay an intermediary who re-sells those services. Their TPA—for the named Plaintiffs, Anthem—performs solely administrative tasks: adjudicating claims, calculating patient responsibilities and allowed amounts, and arranging the transfer of the Plaintiffs' funds to healthcare providers, including NYP. Because

they do not buy from an intermediary who is reselling the services, the Plaintiffs are direct purchasers of healthcare services from NYP.

202. The funds allege that NYP's anticompetitive contract terms suppressed competition for decades and inflated and maintained at supracompetitive levels the prices paid by the Plaintiffs. A clear, direct causal link exists between the alleged violation and the alleged harm.

203. NYP had an improper motive in imposing these terms on insurers and Network Vendors: to suppress competition. Evidence of this improper motive is alleged above in the statements of NYP executives.

204. The nature of the Plaintiff funds' injury is the classic antitrust injury: they allege overcharge damages caused by a violation of the antitrust laws.

205. Their injury is direct. Only they suffered it. Their TPA did not suffer any damages as a result of inflated charges for services delivered to Plaintiffs' members. The TPA did not suffer harm and then pass on that harm to the Plaintiffs, because the TPA has no financial responsibility or liability for charges for Plaintiffs' members. Plaintiffs and members of the Class bear all financial risk related to healthcare services that NYP provides. Thus, only the Plaintiffs were injured by overcharges on services delivered to their members.

206. Plaintiffs' damages are not speculative. Overcharge damages in healthcare cases are routinely proven via insurer claims data.

207. There is no danger of duplicative recoveries or complex apportionment, because no other entity suffered damages as a result of the payments made by the plans. To the extent any of Plaintiffs' members had responsibility for NYP charges because of a deductible or co-

insurance, those amounts can be identified and excluded based on claims data maintained in the ordinary course of business by the plans and their TPA.

## XII. CLAIMS FOR RELIEF

<u>**COUNT ONE**</u>
**RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**

208. The above-alleged paragraphs are incorporated by reference.

209. Defendant NYP entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

210. NYP has and likely will continue to negotiate and enforce contracts containing restrictions on selective contracting with Network Vendors and Payors in the relevant geographic markets. The contracts containing these plan restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

211. NYP has market power in the relevant product market in the relevant geographic markets. That market power has enabled NYP to impose anticompetitive restraints in written agreements and/or in contract negotiations with Network Vendors.

212. NYP has imposed its anticompetitive restraints in its negotiations with all or nearly all Network Vendors it negotiates with in the relevant geographic markets, as well as all or nearly all Payors that use the networks that Network Vendors negotiate when paying NYP for health care NYP provides.

213. NYP enforces these restraints to prevent steering, tiered networks, narrow networks, and other cost-effective selective contracting provisions that would increase price competition between NYP and its competitors and would thus lower prices in the relevant markets.

214. By compelling Network Vendors and Payors to abide by these anticompetitive terms, NYP unlawfully restrains trade and limits the ability of competitors to compete in the relevant markets. NYP's conduct has no procompetitive benefits, and in any event, the anticompetitive effects of NYP's conduct outweigh any purported non-pretextual, procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

215. Because NYP imposes these restraints on all or nearly all Network Vendors and Payors, NYP's anticompetitive contracting terms have affected competition as a whole in the relevant market.

216. As a proximate result of NYP's unlawful conduct, Plaintiffs and members of the Proposed Class have been, and continue to be, harmed—including by having paid and continuing to pay NYP prices that are higher than they would have been absent NYP's anticompetitive conduct.

217. On information and belief, Plaintiffs and members of the Proposed Class have also paid higher prices at other hospital systems in the relevant markets due to the upward pressure on prices NYP's conduct has created in the broader market for inpatient GAC hospital services in the relevant geographic markets.

218. Plaintiffs and members of the Proposed Class have been injured in their business or property in violation of the Sherman Act, including by having been subjected to and paying supracompetitive prices to NYP for inpatient GAC hospital services during the Class Period. Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of NYP's unlawful conduct.

70

219.     Under 15 U.S.C. § 1 and 15 U.S.C. § 15, Plaintiffs and the members of the Proposed Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**COUNT TWO**
**RESTRAINT OF TRADE IN VIOLATION OF THE DONNELLY ACT**
**(N.Y. Gen Bus. Law § 340, *et seq*)**

220.     The above-alleged paragraphs are incorporated by reference.

221.     Defendant NYP entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of the Donnelly Act.

222.     NYP has market power in the relevant product market within the relevant geographic markets. That market power has enabled NYP to impose anticompetitive restraints in written agreements and/or in contract negotiations with Network Vendors.

223.     NYP has imposed its anticompetitive restraints in its negotiations with all or nearly all Network Vendors it negotiates with in the relevant geographic markets, as well as on all or nearly all Payors that use the networks that Network Vendors negotiate when paying NYP for health care NYP provides.

224.     NYP enforces these restraints to prevent steering, tiered networks, narrow networks, and other cost-effective selective contracting provisions that would increase price competition between NYP and its competitors and would thus lower prices in the relevant markets.

225.     By compelling Network Vendors and Payors to abide by these anticompetitive terms, NYP unlawfully restrains trade and limits the ability of competitors to compete in the

relevant markets. NYP's conduct has no procompetitive benefits, and in any event, the anticompetitive effects of NYP's conduct outweigh any purported non-pretextual, procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

226. Because NYP imposes these restraints on all or nearly all Network Vendors and Payors, NYP's anticompetitive contracting terms have affected competition as a whole in the relevant market.

227. As a proximate result of NYP's unlawful conduct, Plaintiffs and members of the Proposed Class have been, and continue to be, harmed—including by having paid and continuing to pay NYP prices that are higher than they would have been absent NYP's anticompetitive conduct.

228. On information and belief, Plaintiffs and members of the Proposed Class have also paid higher prices at other hospital systems in New York City due to the upward pressure on prices NYP's conduct has created in the broader market for inpatient GAC hospital services in New York City.

229. Plaintiffs and members of the Proposed Class have been injured in their business or property in violation of the Donnelly Act, including by having been subjected to and paying supracompetitive prices to NYP for inpatient GAC hospital services during the Class Period. Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of NYP's unlawful conduct.

230. Plaintiffs and the members of the Proposed Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT THREE
### UNJUST ENRICHMENT

231. The above-alleged paragraphs are incorporated by reference.

232. Alternatively, from NYP's unfair acts as alleged above, NYP has been unjustly enriched at the expense of Plaintiffs and members of the Proposed Class.

233. NYP has been unjustly enriched by retaining artificially high payments for inpatient services purchased by Plaintiffs and members of the Proposed Class.

234. NYP has been enriched at the expense of Plaintiffs and members of the Proposed Class.

235. The retention of these payments by NYP violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiffs and members of the Proposed Class.

## XIII. JURY DEMAND

236. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

## XIV. PRAYER FOR RELIEF

237. WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Proposed Class, respectfully request that this Court enter judgment on their behalf, and on behalf of those similarly situated, and adjudge and decree as follows:

    (a)    Certify the Proposed Class, direct that reasonable notice be given to the class, designate the named Plaintiffs as class representatives, and allow Plaintiffs and the Class to have a trial by jury;

(b) Find that Defendant has unreasonably restrained trade in violation of the Sherman Act and the Donnelly Act and that Plaintiffs and the class members have been damaged and injured in their business and property as a result of these violations;

(c) Order that Plaintiffs and members of the class recover the damages determined to have been sustained by them as a result of the Defendant's misconduct complained of herein, in an amount to be trebled in accordance with such laws, and that judgment be entered against Defendant for the amount so determined;

(d) Enter judgment against Defendant and in favor of Plaintiffs and the class awarding restitution and disgorgement of ill-gotten gains to the extent such an equitable remedy be allowed by law;

(e) Award reasonable attorneys' fees, costs, expenses, pre-judgment and post-judgment interest, to the extent allowable by law;

(f) Award equitable, injunctive, and declaratory relief, including but not limited to declaring Defendant's misconduct unlawful and enjoining it, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged herein above; and

(g) Award such other and further relief as the Court may deem just and proper.

Respectfully submitted this 5th day of June, 2026.

<table>
<tr><td>/s/ <em>Gregory S. Asciolla</em></td><td>/s/ <em>Jamie Crooks</em></td></tr>
<tr><td>Gregory S. Asciolla</td><td>Jamie Crooks (admitted <em>pro hac vice</em>)</td></tr>
<tr><td>Geralyn J. Trujillo</td><td>Michael Lieberman (<em>pro hac vice</em> forthcoming)</td></tr>
<tr><td>Theodore J. Salem-Mackall (admitted <em>pro hac vice</em>)</td><td>Amanda R. Vaughn (admitted <em>pro hac vice</em>)</td></tr>
<tr><td><strong>DICELLO LEVITT LLP</strong></td><td>Yinka Onayemi</td></tr>
<tr><td>485 Lexington Avenue, Suite 1001</td><td><strong>FAIRMARK PARTNERS LLP</strong></td></tr>
<tr><td>New York, NY 10017</td><td>400 7th Street, NW, Suite 304</td></tr>
<tr><td>(646) 933-1000</td><td>Washington, DC 20004</td></tr>
<tr><td>gasciolla@dicellolevitt.com</td><td>(619) 507-4182</td></tr>
<tr><td>gtrujillo@dicellolevitt.com</td><td>jamie@fairmarklaw.com</td></tr>
<tr><td>tsalemmackall@dicellolevitt.com</td><td>michael@fairmarklaw.com</td></tr>
<tr><td></td><td>amanda@fairmarklaw.com</td></tr>
<tr><td></td><td>yinka@fairmarklaw.com</td></tr>
<tr><td>Domenico Minerva</td><td></td></tr>
<tr><td><strong>LABATON KELLER SUCHAROW LLP</strong></td><td>Frank R. Schirripa</td></tr>
<tr><td>140 Broadway</td><td>Gwendolyn Nelson</td></tr>
<tr><td>New York, NY 10005</td><td>Scott Jacobsen</td></tr>
<tr><td>(212) 907-0887</td><td><strong>HACH ROSE SCHIRRIPA & REHNS LLP</strong></td></tr>
<tr><td>dminerva@labaton.com</td><td>112 Madison Avenue, 10th Floor</td></tr>
<tr><td></td><td>New York, NY 10016</td></tr>
<tr><td>Deborah A. Elman</td><td>(212) 213-8311</td></tr>
</table>

74

David B. Rochelson
**GARWIN GERSTEIN & FISHER LLP**
88 Pine St, 28th Floor
New York, NY 10005
(212) 398-0055
delman@garwingerstein.com
drochelson@garwingerstein.com

Brendan P. Glackin (admitted *pro hac vice*)
Lin Y. Chan (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000
bglackin@lchb.com
lchan@lchb.com

Rebecca P. Chang
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street
New York, NY 10013
(212) 355-9500
rchang@lchb.com

*Counsel for UFCW Local 1500 Welfare Fund*

fschirripa@hrsrlaw.com
gnelson@hrsrlaw.com
sjacobsen@hrsrclaw.com

William Dreher (admitted *pro hac vice*)
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
(206) 623-1900
wdreher@kellerrohrback.com

*Counsel for Cement and Concrete Workers DC
Benefit Fund, and the Pointers, Cleaners &
Caulkers Local 1 Welfare Fund*

Christopher C. Wheeler (*pro hac vice*
forthcoming)
Alexis J. Loeb
**FARELLA BRAUN & MARTEL LLP**
One Bush Street, Suite 900
San Francisco, CA 94104
(415) 954-4400
cwheeler@fbm.com
aloeb@fbm.com

Jacob W. Buchdahl
Mark Musico
Jeffrey Xia
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001
(212) 336-8330
jbuchdahl@susmangodfrey.com
mmusico@susmangodfrey.com
jxia@susmangodfrey.com

Steven G. Sklaver (*pro hac vice* forthcoming)
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
ssklaver@susmangodfrey.com

*Counsel for Pointers, Cleaners & Caulkers Local
1 Welfare Fund*