**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND and CEMENT AND CONCRETE WORKERS DC BENEFIT FUND, | 25-cv-05023-BMC<br>25-cv-05571-BMC |
| Plaintiffs, | Hon. Brian M. Cogan |
| v. | |
| THE NEW YORK AND PRESBYTERIAN HOSPITAL, | |
| Defendant. | |

## NYP'S RESPONSE TO THE DOJ'S STATEMENT OF INTEREST

The DOJ filed its Statement of Interest on the eve of NYP's Motion to Dismiss Reply, urging this Court to adopt legal standards that would erase its own burdens of pleading and proof in its parallel case in the Southern District. The Court should decline. The standard it advances is dangerous to our nation's free market: it would transform the Sherman Act into a price-regulation statute that requires no showing whatsoever of any diminution of competition.[1]

### A.      *The Court Should Reject the DOJ's "the Defendant's Products are Too Expensive" Test for Pleading Direct Evidence of Market Power.*

The DOJ embraces the unions' standard for pleading direct evidence of market power because it *obliterates* the requirement.

The DOJ says it is enough that the seller is "the most expensive," that its prices are the "result of material bargaining" leverage, and that the "challenged restraints" help it win more sales.

---

[1] Unless otherwise noted, all emphasis added, internal citations and quotation marks omitted, and capitalizations and punctuation conformed without brackets.

D. Br. 5.  If that sufficed, nearly every firm that produces a product people want – think Evian®

water, for instance – possesses "market power."  It is not enough.

Consider a market with a thousand equal-sized sellers offering slightly different products

at different prices.  Now take the most expensive one and suppose it signs an exclusive contract

with a single customer out of a million.  Does that seller have market power?  Certainly not.  But

under the DOJ's standard, the answer would be "certainly yes."  It shows the standard is wrong.

In *Amex*, the Supreme Court "disagree[d]" that defendant-specific evidence alone sufficed

to establish "actual evidence of adverse effects on competition."  *Ohio v. Am. Express Co.*

*("Amex")*, 585 U.S. 529, 543 n.7 (2018).  Whatever probative value such evidence might carry in

a horizontal case – where market power need not be proven – it is not enough in a vertical case

because vertical restraints "pose no risk to competition unless the entity imposing them has market

power."  *Id*.

The DOJ counters that "nothing in [*Amex*] precludes a showing of direct evidence of

market power."  D. Br. 5.  That is a strawman.  NYP never said direct evidence can't be used to

prove market power.  We said that (i) in a vertical case, market power is required; and (ii) pleading

direct evidence of it requires allegations about *market-wide* prices and output, not just the

*defendant's* own prices and contracts.

The DOJ now concedes it needs market power.  But its position – that allegations of NYP's

prices and practices suffice – contradicts *Amex*.  The Court rejected reliance on evidence limited

to a corner of the market, explaining that the Sherman Act does not "forbid[] any restraint that

would restrict competition [only] in **part of the market**" or that merely "affects **one particular**

**method of competition**." *Amex*, 585 U.S. at 449, 551 & n. 10.   Because the inquiry is market-

wide, evidence that "output of credit-card transactions [in the United States] grew dramatically"

was fatal.  *Id*.  The DOJ therefore could "not prove that Amex's anti-steering provisions gave it the power to charge anticompetitive prices" despite its high prices and steering restrictions.  *Id*.

The DOJ has no answer.  So it tries to drive a wedge between market definition and market power, treating them as unrelated boxes to check.  But they are inseparable – the same "market" governs both definition and power.  A court cannot define a market to include many sellers, and then, when assessing power, disregard them all except the defendant.

If the unions wanted to litigate NYP's pricing and contracts in isolation, they needed to define an NYP-only market.  The unions declined, presumably because "time and time again, courts in this circuit have rejected attempts by antitrust plaintiffs to limit the relevant market to a single brand or product."  *In re Am. Express Anti-Steering Rules Antitrust Litig.* ("*In re Amex*"), 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (citing cases).  Because the unions did not plead a single-brand market, they cannot "look at the power … manufacturers have over their trademarked products."  Instead, "illegal market power must be appraised in terms of the competitive ***market*** for the product."  *Id*. (emphasis in original).

Were it otherwise, a plaintiff could point to a contractual restraint by any high-priced seller as evidence of both market power and anticompetitive effect.  But that would render any challenged practice *per se* illegal.  That is why, where a plaintiff claims that a "defendant has economic power in a proposed market due exclusively to the contractual arrangements it has entered into with a distinct class of consumers, *an antitrust claim with respect to that market cannot lie*."  *Id.* at 347.

**B.      *The Court Should Reject the DOJ's Standardless "Market Share" Standard.***

The DOJ's indirect-evidence theory fares no better.  Not because the shares are high—the DOJ concedes NYP's are not.  Instead, it argues that courts have avoided establishing market share thresholds.  D. Br. 6.  That is a standardless standard for pleading power.  Courts can and do set

share thresholds.  In fact, "since *Jefferson Parish*, no court has inferred substantial market power from a market share below 30%."  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir. 1998); *Union Carbide Corp. v. Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998) (same, citing cases); *Abbott Lab'ys v. Adelphia Supply USA*, 2018 WL 8967057, *3 (E.D.N.Y. 2018) ("Where plaintiffs use market share as a proxy for market power, courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power"); *Com. Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (same).

In arguing otherwise, the DOJ points to its own, pre-*Amex* case in *U.S. v. Visa USA*, Inc., 344 F.3d 229 (2d Cir. 2003).  As NYP's Reply explained, Visa and MasterCard were owned and controlled by the same member banks and so were not independent competitors.  Together, they had a combined 73% share, and "jointly" possessed market power.  As to MasterCard alone, it was the second-largest firm in just a four-player market.  Yet the court did not rely on share alone; it turned to direct evidence.  *Id.*; *see also In re Payment Card Interchange Fee Antitrust Litig.*, 714 F. Supp. 3d 65, 98 (E.D.N.Y. 2024) (given MasterCard's low 26% share, it could not use "market share as a proxy for market power.").  But the direct evidence was the same kind – in the same market with the same-sized defendant – that the Supreme Court later rejected as insufficient in *Amex*.  *Visa* does not disturb the Supreme Court's guidance that 30% is not enough.

The only other case the DOJ cites to support its view – that courts require allegations of market share, but do not set thresholds for it – is the 1981 decision in *Broadway Delivery Corp. v. UPS of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981).  *Broadway* addressed only whether monopoly power requires shares above 50%.  The court did not resolve that question, but noted that no less an authority than Judge Learned Hand expressed doubt that a defendant could wield such power

4

with shares below 66%, and it cited with approval cases *rejecting* shares of only 33% as evidence of "substantial market power." *Id*. The court then found that UPS – despite its ubiquitous big brown trucks and reputation for dominance – lacked market power. That disproves the DOJ's point; it does not support it.

### C. The Court Should Reject the DOJ's Attempt to Read the "Anticompetitive Conduct" Element Out of the Claim.

The DOJ tries to excuse the unions' "failure to allege exclusionary contracts and foreclosure of rivals." D. Br. 6. Conceding neither has been alleged, it instead argues that "effects" – which it defines as NYP's alleged high prices – are enough to condemn NYP's participation agreements. But the Sherman Act is not a price regulation statute. Even a monopolist can charge what the market will bear. *Verizon Commc'ns Inc. v. Trinko*, LLP, 540 U.S. 398, 407 (2004) (freedom to set price "is an important element of the free-market system"). To condemn a contract, the plaintiff must show that it constitutes a "restraint of trade," not competition on the merits. The DOJ's proposed standard skips over this "anticompetitive conduct" requirement.

In response, the DOJ argues that effects are enough because Section 1 reaches not just "exclusionary conduct" but also "collusive effects involving a decrease or softening in the intensity of competition among rivals." D. Br. 6. That is a non sequitur. The Complaint alleges no collusive conduct at all. So, the DOJ's argument – that the Sherman Act condemns all price-rising conduct, even if not exclusionary or collusive – is not and never has been the law.

The DOJ's cases prove the point.[2] *O'Bannon* involved an alleged horizontal conspiracy by virtually every college in the nation—precisely, the collusive conduct absent here. In contrast, *Leegin* rejected liability for resale price maintenance because the *price-raising* conduct there, like

---

[2] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F.3d 1049, 1071–72 (9th Cir. 2015); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

here, was not collusive. In the two decades since *Leegin* was decided, no court appears to have condemned resale price maintenance absent an allegation of a horizontal or hub-and-spokes conspiracy, even though the whole purpose of such pricing schemes is to raise price.

The DOJ's reliance on *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 358 (4th Cir. 2024), is also misplaced. The Fourth Circuit did not skip the anticompetitive conduct element. It applied *Brooke Group*'s predation test and found a fact dispute over whether the defendant priced below cost pursuant to a "strategy [of] recoupment," thus, requiring proof of exclusionary conduct and foreclosure. *Id*. It did not excuse their omission of these elements in favor of "effects" alone.

The Supreme Court's decision in *Amex* controls. There, the Court held that there is "nothing inherently anticompetitive about … anti-steering provisions" because "perhaps *most importantly*, [the] antisteering provisions do not prevent Visa, MasterCard, or Discover from competing against Amex." *Amex*, 585 U.S. at 551. That is, the Supreme Court found that, *because* the conduct is not inherently suspect, the DOJ was required to prove competitive *exclusion*, which it could not do, and which the unions do not even *attempt* here.

The DOJ responds in two ways, neither of which excuses that failure. *First*, it accuses NYP of "omitting a key portion" of the quote by ellipsing Amex's name. D. Br. 8. That is like saying the Supreme Court holdings lack precedential force because the caption changes from case to case. *Second*, it says that NYP "overstates" Amex's holding because the court only "acknowledge[d] that restraints are not *per se* unreasonable and are subject to the 'rule of reason.'" D. Br. 8. That is not a faithful reading. Rule-of-reason treatment was never in dispute. The court reached its conclusion at the *end* of its rule-of-reason analysis, holding that, *because* the provisions

6

were not inherently suspect, evidence of exclusion *is* necessary. *Amex,* therefore, does not support the DOJ's position that competitive exclusion is *not* necessary.

> **D.** **The Court Should Reject the DOJ's Attempt to Show Anticompetitive Effects with Zero Foreclosure.**

The DOJ's "anticompetitive effects" argument repeats the same error as its market power argument: it condemns NYP's prices without any evidence of any effect on *competitors*. Without such competitive foreclosure, there is no "ability to raise price profitably *by restricting output*." *Amex*, 585 U.S. at 549 (*citing* Areeda & Hovenkamp § 5.01).

The DOJ first tries to distinguish Judge Posner's decision in *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). It claims Judge Posner – a titan of antitrust law and economics – was not commenting on the law of economics when he explained that foreclosure is required under the rule of reason, but was just reciting the technical elements of Section 3 of the Clayton Act. That is not a faithful read of context or case.

Section 3 was designed to make challenges to exclusive dealing *easier*, not harder. It applies the Clayton Act's familiar "may … substantially lessen competition" standard, which – unlike the rule of reason – only requires *probable*, not actual, anticompetitive effects, unlike Section 1. *Id*. at 381. Yet even under the more lenient standard, Judge Posner grounded the analysis in general antitrust economics, explicitly adopting the rule of reason. *Id*. at 394. As he explained:

> "The exclusion of competitors is cause for antitrust concern only if it impairs the health of the competitive process itself… Hence, a plaintiff must allege two things to show that an exclusive-dealing arrangement is unreasonable.
>
> *First*, he must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition.
>
> *Second*, he must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore output below) the competitive…." *Id.*

If foreclosure is required under the easier standard of Section 3 and the more inherently exclusionary conduct of "exclusive" dealing, then certainly it is required for the stricter standard under Section 1 and the less exclusionary practice of seeking participation in insurers' networks.

Finally, the DOJ cites *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 282 (S.D.N.Y. 2015). That case also cuts the other way. Far from endorsing an "effects without foreclosure" rule, the court found a factual dispute over whether the defendant – the operator of the nation's only significant airline booking service – excluded competitors. As the court noted, the plaintiff introduced evidence beyond supracompetitive pricing, including "***substantial evidence*** … that Sabre believed that the [challenged restraints] were responsible for ***preventing entry of competitors***." *Id*. That kind of foreclosure is exactly what is missing here.

### E. The Court Should Decline to Consider the DOJ's Statement of Interest

The Court should decline to consider the DOJ's Statement of Interest. It was filed in support of the unions' opposition to NYP's motion to dismiss, but did not comply with this Court's June 30th deadline for filing such oppositions. Instead, the DOJ filed it less than 24 hours before NYP's reply brief was due, and without complying with this Court's rules for filing amici briefs. *See In re Turkey Antitrust Litig.*, 1:19-cv-8318, ECF 1789 (N.D. Ill. Apr. 10, 2026) (declining to consider the DOJ's late-filed statement of interest); *LSP Transmission Holdings, LLC v. Lange*, 329 F. Supp. 3d 695, 703 (D. Minn. 2018) (declining to consider late-filed statement of interest).[3]

---

[3] The DOJ finds authority to file its Statement in 28 U.S.C. § 517. But § 517 only permits the DOJ to "attend to the interests of the United States" by entering an appearance or otherwise attending a proceeding. It does not grant the DOJ party status or give it carte blanche to file anything it wants in response to any motion it wants. Any substantive submission remains subject to this Court's procedural rules, including the requirement that *argument on the merits* comply with the rules for amicus briefs. To put a finer point on it, only the Section of the statement titled "Interest of the United States" is within the scope of § 517. Anything after that – meaning anything after page 1, including its argument – should be disregarded as unauthorized.

The DOJ's statement is also duplicative of the unions' arguments. Having elected a different forum, the DOJ should not get two bites at the apple. Courts have declined to consider DOJ Statements in similar circumstances. In *In re Turkey Antitrust Litig.*, for example, the Northern District of Illinois declined to consider a Statement the DOJ submitted to address the "relevant … precedent and the legal standard to apply" that should govern that class action and its own parallel case filed in a different forum. *See* 1:19-cv-8318, ECF 1789 (N.D. Ill Apr. 10, 2026). Similarly, in *Cornish-Adebiyi v. Caesars Enter., Inc.*, the District of Nevada denied leave to file the DOJ's Statement of Interest, noting that "the Court need not give the DOJ's views any 'special deference' and the "proffered [statement] is not particularly helpful…" *See* 1:23-cv-02356 (D. Nev. Apr. 23, 2024). Here too, the parties are perfectly capable of briefing the legal issues without DOJ interference in the briefing process.

**CONCLUSION**

The Court should disregard the DOJ's attempt to lessen its pleading burden – it is procedurally improper and the standard it advances is at odds with the Sherman Act's role as guardian of the free enterprise system.

Dated: July 10, 2026

Respectfully submitted,

/s *Colin R. Kass*

Colin R. Kass*
KaDee L. Ru**
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, N.W.
Washington, D.C. 20004
(202) 416-6800
ckass@proskauer.com
kru@proskauer.com

Vinay Kohli**
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067

David A. Munkittrick
Reut N. Samuels
Portia S. Proctor
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000
dmunkittrick@proskauer.com
rsamuels@proskauer.com
pproctor@proskauer.com

Attorneys for The New York and
Presbyterian Hospital

*Admitted Pro Hac Vice*
***Pro Hac Vice Forthcoming*

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.1(c), I hereby certify that the total number of words in this memorandum, excluding the caption, signature block, and word count certification is 2,756.

/s/ *Colin R. Kass*