UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,

Plaintiff,

- against -

THE NEW YORK AND PRESBYTERIAN HOSPITAL,

Defendant.

CEMENT AND CONCRETE WORKERS DC BENEFIT FUND, on behalf of itself and all others similarly situated, *et al.*,

Plaintiff,

- against -

THE NEW YORK AND PRESBYTERIAN HOSPITAL,

Defendant.

**MEMORANDUM DECISION AND ORDER**

25-cv-5023 (BMC)
25-cv-5571 (BMC)

**COGAN**, District Judge.

Plaintiff Cement and Concrete Workers DC Benefit Fund ("CCWDC") is a self-funded healthcare plan that provides benefits to over 1,700 union members, dependents, and retirees of the Cement & Concrete Workers District Council in New York City. Plaintiff United Food and Commercial Workers Local 1500 Welfare Fund ("UFCW") is a self-funded, multi-employer, welfare benefits fund that provides healthcare benefits to members and dependents of New York's largest grocery store union, UFCW Local 1500. Plaintiff Pointers, Cleaners & Caulkers Local 1 Welfare Fund ("PCC") is a self-funded union healthcare plan that provides benefits to over 2,500 union members, dependents, and retirees of the Pointers, Cleaners & Caulkers Local

1 union. Together, plaintiffs challenge several contractual provisions that The New York and Presbyterian Hospital ("NYP") imposes as part of its negotiations with health insurance companies. Plaintiffs allege that these provisions unlawfully restrain trade, reduce competition, and increase healthcare prices in violation of the Sherman Act, 15 U.S.C. § 1.

This case is before the Court on defendant's motion to dismiss and plaintiffs' competing motions to appoint interim class counsel. For the reasons that follow, defendant's motion to dismiss is denied; CCWDC and PCC's motion to appoint interim class counsel is granted; and UFCW's motion to appoint interim class counsel is denied.

## BACKGROUND[1]

Many businesses, unions, and local governments pay for their employees' or members' healthcare through health plans designed by insurance companies. There are two types of plans: fully insured health plans and self-funded health plans. In a fully insured health plan, the employer and its employees pay premiums to the insurance company. In turn, the insurance company acts as "payor" – that is, it bears financial responsibility (including the risk of loss) for plan members' healthcare expenses. By contrast, in a self-funded health plan, an employer (or union) is the payor and bears financial responsibility for plan members' healthcare expenses.

Self-funded payors, like plaintiffs, generally engage insurance companies for two non-insurance services. First, insurance companies provide access to a network of healthcare providers that the insurance company has assembled by negotiating contracts with those providers. In this capacity, insurance companies act as "network vendors." Network vendors work directly with providers, like NYP, to bundle services at negotiated rates so that self-funded payors do not have to negotiate individually with every provider from whom their members

[1] The Court summarizes the following facts from plaintiffs' complaint and assumes them to be true for purposes of the motion to dismiss.

might receive care. Consistent with this arrangement, the payors pay the network vendors a fee for the bundling services and the providers for the healthcare services.[2]

Second, insurance companies offer claims processing, including the arrangement of payments from the self-funded payor to the healthcare provider to pay for care rendered to the payor's members. In this capacity, insurance companies act as "third party administrators." Third party administrators simply facilitate payment from the payors to the providers; in exchange, third party administrators receive a fee from the payors.

In a competitive market, network vendors create provider networks and benefit structures that encourage price and quality competition among providers. The ability to encourage such competition among providers for inclusion in healthcare products is known as "selective contracting." For example, network vendors may decline to include in their networks any services from a hospital if its prices or quality of care are not competitive with other nearby hospitals. Similarly, network vendors may include in their networks some cluster of services from one hospital and some cluster of services from a different hospital because each hospital provides some higher-quality or lower-cost services than the other. Providers do not want to be excluded from networks because patients are much less likely to obtain medical services from out-of-network providers; thus, exclusion (or the threat thereof) spurs providers to compete to provide the highest quality and most affordable care.

The threat of exclusion also allows network vendors to assemble "narrow networks," which are network plans that consist of a smaller set of providers than "broad networks" and typically exclude the most expensive providers. Providers will offer network vendors a

[2] The prices negotiated between network vendors and providers for in-network care are known as "allowed amounts." The "allowed amount" is typically the price that the self-funded payor is contractually obligated to pay the provider for a service.

substantial reduction on their rates for inclusion in a narrow network because being in a smaller pool means that a higher proportion of members will seek care from that provider. Thus, by offering narrow networks to their members (who benefit from such plans because those plans have lower premiums and out-of-pocket expenses than broad networks), payors can achieve lower costs and generate further price competition among providers.

Beyond removing high-cost providers from networks, network vendors and payors can steer members toward lower-cost providers that offer the same or better quality of care as higher-cost providers. Forms of steering include:

- **Tiering:** Network vendors place less expensive, higher-quality providers in a higher tier than more expensive, lower-quality providers and then incentivize members to choose providers in a higher tier through, *e.g.*, lower out-of-pocket costs.

- **Site of service:** Network vendors incentivize patients to have procedures done at less expensive locations, like outpatient centers, instead of more expensive locations, like hospitals.

- **Center of excellence:** Network vendors and payors identify specific cost-effective programs of excellent quality and encourage members to choose care at those facilities by reducing or waiving the fees that members must pay.

- **Increased price transparency:** Network vendors and payors disclose to members the prices for various services at competing facilities, making members more likely to choose to obtain services at lower-cost facilities, even in the absence of any additional incentives.

Steering (and the threat thereof) enhances competition between providers. But providers with market power can stifle the price and quality competition that steering would otherwise generate by imposing various anticompetitive restraints. NYP has allegedly done just that through the following restraints:

- **All products provision:** A network vendor that wishes to include any NYP provider or facility in any of its networks must include all NYP providers and facilities in all its networks and at the highest tier or benefit level, irrespective of cost or quality.

- **<u>Single negotiated rate provision</u>:** Network vendors must accept the rate that NYP charges at its most expensive flagship hospitals when members obtain care at any of NYP's hospitals, irrespective of their location, proximity to competitors, quality, or ratings.

- **<u>Gag clauses</u>:** Network vendors and payors cannot disclose NYP's pricing terms to members, preventing members from knowing the cost of care before they receive the care. In addition, network vendors cannot disclose NYP's contractual restraints to payors. If payors engage in steering (without knowing that NYP's terms prohibit it), network vendors will terminate the relevant contracts without telling payors why.

Together, these restraints prohibit network vendors from creating (1) narrow networks that exclude NYP providers; (2) tiered networks in which NYP does not sit at the top; and (3) programs that would lower payors' costs by sharing truthful pricing information with members. In turn, payors have no means of incentivizing members to seek care at lower-cost competitors. Moreover, NYP's competitors have less incentive to provide lower prices because they will still be tiered at the same level as or below NYP.

NYP can therefore set and maintain supracompetitive prices in the relevant product market (inpatient general acute care) and geographic markets (Manhattan and Brooklyn, Queens, Manhattan, and the Bronx together). Specifically, NYP's standardized prices per inpatient stay, both generally and within specific inpatient service lines (*e.g.*, orthopedics, childbirth, circulatory system, respiratory system), are significantly higher than the prices at other major New York hospitals, including NYU Langone, Lenox Hill, Mount Sinai, Mount Sinai West, and Mount Sinai Beth Israel. NYP also charges higher prices than competitor hospitals for specific procedures (*e.g.*, joint replacements, spinal fusions, C-sections, coronary bypasses). NYP would not be able to consistently charge higher prices than its nearby, high-quality (sometimes higher-quality) competitors absent the restraints that it imposes on network vendors and payors.

The relevant product market – inpatient general acute care – includes the sale of such services to individual, group, fully insured, and self-funded health plan sponsors (the "Inpatient

GAC Market"). There are a few reasons why this is the relevant product market. First, network vendors typically contract for inpatient general acute care services as a single cluster when negotiating with a hospital. Second, demand for inpatient general acute care is generally inelastic because such services are often necessary to prevent death or long-term harm; there is no good substitute for inpatient general acute care. Finally, the Inpatient GAC Market has extremely high barriers to entry relative to other product markets, including significant time and expense to build facilities; difficulty hiring skilled staff; regulatory hurdles; and limited real estate (particularly in New York City). Thus, a hypothetical monopolist in the Inpatient GAC Market could raise the prices that it charges to payors for inpatient general acute care by a small but significant amount over a sustained period and remain profitable. According to plaintiffs, that is what NYP has done.

There are two relevant geographic markets: Manhattan on its own (the "Manhattan Market"), and the Bronx, Brooklyn, Manhattan, and Queens together (the "Four-Borough Market"). With respect to the Manhattan Market, many patients who seek healthcare in New York City prefer to receive inpatient general acute care at Manhattan's well-regarded hospitals, such that a plan without Manhattan in-network hospitals would not be desirable to patients or payors. With respect to the Four-Borough Market, a plan without in-network hospitals in these four boroughs would not be desirable to patients or payors because patients living in New York City prefer to receive inpatient general acute care at hospitals close to where they live and work. In many circumstances, it would also be medically unsafe for patients to trek elsewhere. Thus, payors offering health plans to members who live or work in the Manhattan Market or the Four-Borough Market do not view hospitals outside of those markets as reasonable alternatives, particularly for inpatient general acute care. Thus, a hypothetical monopolist of the Manhattan

or Four-Borough Markets could raise the prices it charges to payors for hospital services, such as inpatient general acute care, by a small but significant amount over a sustained period and remain profitable.

NYP has market power in the Inpatient GAC Market and in the Manhattan and Four-Borough Markets due to all the aforementioned dynamics as well as its size, number of facilities (including in medically underserved areas), comprehensive offerings, and perceived status. NYP can persistently and profitably charge supracompetitive prices without fear of losing patients. Indeed, NYP charges higher prices than competitors in New York City despite having some lower-quality and safety ratings. NYP nevertheless remains in-network for over 95% of payors in the relevant geographic markets. Network vendors continue to contract with NYP notwithstanding the contractual restraints that it imposes, and the restraints are rarely violated. All of this is evidence of NYP's market power.

Plaintiffs allege that NYP's restraints – the all-products provision, the single negotiated rate provision, and the gag clauses – are anticompetitive and lack procompetitive justifications. This case is a putative class action seeking equitable and monetary relief under the Sherman Act and the Donnelly Act and for unjust enrichment. The putative class is "[a]ll entities that purchased in-network generate acute care inpatient hospital services from [NYP] at any point during the period from four years prior to filing to the present."

**DISCUSSION**

NYP raises five challenges in its motion to dismiss: (1) plaintiffs are too remote to challenge insurance company-provider negotiations; (2) plaintiffs' claims are barred by <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977); (3) plaintiffs fail to allege market power; (4) plaintiffs fail to allege exclusionary contracts; and (5) plaintiffs fail to allege rival foreclosure. The first

two challenges are about plaintiffs' standing, and the latter three challenges are about the merits of plaintiffs' claims. The Court addresses each of these challenges in turn.

# I. Standing

## A. Legal Standard

"To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of clearly alleging facts demonstrating each element of standing." Incinia Contracting, Inc. v. Evanston Ins. Co., 806 F. Supp. 3d 372, 376 (S.D.N.Y. 2025) (citing Warth v. Seldin, 422 U.S. 490, 517-18 (1975)). "To demonstrate antitrust standing, a private plaintiff must show both that (1) 'it suffered a special kind of antitrust injury' and that (2) 'it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.'" In re Am. Express Anti-Steering Rules Antitrust Litig., 19 F.4th 127, 138 (2d Cir. 2021) ("Am. Express (2d Cir.)") (quoting Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76 (2d Cir. 2013)).

## B. Analysis

Defendant first argues that plaintiffs are not "efficient enforcer[s] of the antitrust laws" and thus lack standing. In determining whether a plaintiff is an efficient enforcer, courts look to the four factors that the Supreme Court identified in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) ("AGC"):

> (1) "the directness or indirectness of the asserted injury"; (2) "the existence of more direct victims" or the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the extent to which the claim is "highly speculative"; and (4) "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

Am. Express (2d Cir.), 19 F.4th at 138 (quoting AGC, 459 U.S. at 540-45).

Defendant primarily argues that plaintiffs do not satisfy the first factor, which "turns on familiar principles of proximate causation." Am. Express (2d Cir.), 19 F.4th at 139 (quoting

Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 412 (2d Cir. 2014)). "In the context of antitrust standing, proximate cause generally follows the first-step rule," meaning "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." Am. Express (2d Cir.), 19 F.4th at 139. Conversely, injuries that do *not* happen at the first step – for example, indirect injuries which merely flow from direct injuries suffered by third parties – are *not* proximately caused.

Although courts must consider all four efficient-enforcer factors, "the efficient-enforcer inquiry remains, fundamentally, one into proximate cause." Id. at 143 (citing Lotes, 753 F.3d at 412). When proximate cause is not satisfied, antitrust claims are likely to fail for lack of standing. See, e.g., Am. Express (2d Cir.), 19 F.4th at 140-141 (merchants who did not accept credit card company's cards or enter its agreements did not suffer direct injuries when the credit card company raised fees for merchants who did accept its cards); IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 65 (2d Cir. 2019) (dental supplier did not suffer direct injuries when customers boycotted its online sales portal because the portal was owned by another company).

NYP argues that plaintiffs lack standing because they are "too far removed from the challenged negotiations." NYP's position is that the challenged provisions merely affect the types of plans that *network vendors* offer. In other words, plaintiffs cannot sue NYP because plaintiffs did not negotiate the plans and were not the first supposed victims. NYP thus appears to take the position that if anyone was proximately harmed by its conduct, it was the network vendors, with whom NYP negotiates, not the self-funded payors like plaintiffs. But the first-step rule directs courts to consider whether there is "some direct relation between the injury asserted and the injurious conduct alleged," Am. Express (2d Cir.), 19 F.4th at 141 (quoting Bank of Am.

Corp. v. City of Miami, 581 U.S. 189, 202-03 (2017)), not whether there is a direct contractual or other relationship between the alleged antitrust violator and the plaintiff. The fact that network vendors play an intermediary role between NYP and plaintiffs is therefore not dispositive.

Plaintiffs have adequately alleged that they were the first to be harmed because NYP's restraints prevent them from offering cost-effective networks to their members and force them to purchase healthcare services at supracompetitive prices. To the extent that the network vendors have likewise been restricted with respect to what kinds of plans they can craft for self-funded payors, it is still the self-funded payors who end up paying higher costs. See In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009) ("[E]ven though the [drug consumers'] injuries were derivative of the direct harm experienced by the [drug manufacturers'] competitors, harming competitors was simply a means for the [drug manufacturers] to charge the [drug consumers] higher prices.").

Illinois Brick does not bar plaintiffs' claims for the same reasons. In Illinois Brick, the Supreme Court limited antitrust standing to "direct purchasers." 431 U.S. at 745-46; see Apple Inc. v. Pepper, 587 U.S. 273, 279-81 (2019) (reaffirming the Illinois Brick rule). NYP argues that because both network vendors and self-funded payors stand in the chain of distribution, only one of them (the network vendors, *i.e.*, insurers) can have antitrust standing under Illinois Brick. It may be true that only one of network vendors or self-funded payors has standing on behalf of self-funded plans, but defendant does not persuasively explain why it must be the network vendors and not the plaintiffs.[3]

[3] Defendant's concern that insurers could be foreclosed from suing themselves is unfounded. The putative class is defined as "[a]ll entities that purchased in-network generate acute care inpatient hospital services from [NYP]." That includes insurers because insurers are the payors in fully funded plans. Thus, insurers and self-funded payors can both have standing because they are both direct purchasers of hospital services from NYP.

More importantly, it is not true that both network vendors and self-funded payors stand in the chain of distribution. Network vendors contract with NYP to bundle healthcare plans, but they do not pay NYP. And plaintiffs, as self-funded payors, contract with network vendors and pay the vendors a fee to bundle healthcare plans, but they pay NYP for healthcare services. Although there is a two-step process involved in the negotiations of plans, NYP's healthcare services are rendered to plaintiffs (via their members), and plaintiffs pay NYP for those services. See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2024 WL 1014159, at *11 (E.D.N.Y. Mar. 8, 2024) ("The presence of an intermediary does not necessarily mean that the party receiving the benefit of the service is an indirect purchaser of that service."). If this were truly a "chain of distribution," NYP would be selling its healthcare services to insurers, and insurers would be reselling those services, *e.g.*, in bundled plans, to plaintiffs.

In sum, plaintiffs have alleged sufficient facts for antitrust standing. The Court therefore proceeds to defendant's challenges regarding the merits of plaintiffs' claims.

## II. Merits

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The complaint must further "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017)

(quoting Chase Grp. All. LLC v. City of New York Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010)).

**B. Analysis**

Defendant argues that plaintiffs' claims must be dismissed because plaintiffs fail to allege (1) market power; (2) exclusionary conduct; and (3) rival foreclosure. None of these arguments warrant dismissal under Rule 12(b)(6).

i. Market Power

This is a rule of reason case. "To determine whether a restraint violates the rule of reason . . . [courts apply] a three-step, burden-shifting framework." Ohio v. Am. Express Co. ("Am. Express"), 585 U.S. 529, 541 (2018). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." Id.

But first, plaintiffs must define "the relevant market." "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." Id. at 543 (quoting Walker Process Equip. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177). "The relevant market includes the produce or service at issue as well as its substitutes." US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 64 (2d Cir. 2019). There is also a geographic element to market definition. See Concord Assocs., L.P. v. Ent. Props. Trust, 817 F.3d 46, 52 (2d Cir. 2016) (explaining that "a Sherman Act claim must [] define the relevant geographic market," *i.e.*, "identify the precise geographic boundaries of effective competition") (citations omitted). "At the motion-to-dismiss stage, a plaintiff's proposed relevant market must 'bear a rational relation to the methodology courts prescribe to define a market,'" which is "a relatively permissive

pleading standard." Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 338-39 (2d Cir. 2024) (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)).

Plaintiffs have adequately alleged the relevant market here, especially given the "relatively permissive pleading standard." Plaintiffs allege a product market of inpatient general acute care hospital services and geographic markets of Manhattan and the four boroughs of Manhattan, Queens, the Bronx, and Brooklyn.[4] Defendant has offered no real critique of plaintiffs' product market definition, nor could it. The product market of inpatient general acute care hospital services has been accepted by many courts already. See, e.g., FTC v. Hackensack Meridian Health, Inc., No. 20-cv-18140, 2021 WL 4145062, at *1 (D.N.J. August 4, 2021), aff'd, 30 F.4th 160 (3d Cir. 2022); United States v. Charlotte-Mecklenburg Hosp. Auth., 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017). The geographic market is likewise reasonable; it is common sense that people seek hospital services near their homes and places of work and are ordinarily not willing or able to cross state lines or travel upstate for medical procedures.

With market definition squared away, plaintiffs must satisfy their second requirement: demonstrating substantial anticompetitive effect. A plaintiff may satisfy its pleading burden of demonstrating substantial anticompetitive effect through either (1) direct evidence, *i.e.*, "proof of actual detrimental effects" on competition; or (2) indirect evidence, *i.e.*, "proof of market power plus some evidence that the challenged restraint harms competition." Am. Express, 585 U.S. at 542 (citations omitted). Plaintiffs allege both.

Turning first to plaintiffs' direct evidence, substantial anticompetitive effect "may be shown through direct evidence of output reductions, increased prices, or reduced quality in the

[4] At the pleading stage, plaintiffs may plead markets in the alternative. See Daniel v. Am. Bd. of Emergency Med., 802 F. Supp. 912, 925 (W.D.N.Y. 1992) ("A pleading may present alternative statements of the facts. … [Federal Rule of Civil Procedure 8(e)] authorizes hypothetical, alternative, and inconsistent pleadings[.]").

relevant market." 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 118 (2d Cir. 2021). "Output, prices, and quality are compared to the levels that might be observed but for the challenged restraints (a hypothetical scenario often referred to as the 'but-for world')." In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024). Plaintiffs have alleged that defendant charges significantly higher prices than other hospitals in the New York area, which it is able to do because of its anticompetitive restraints. But when a plaintiff "advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented." 1-800 Contacts, 1 F.4th at 118. Plaintiffs' allegations compare defendant's prices to other hospitals' prices; they do not necessarily suggest that prices in the relevant market increased specifically after defendant started imposing the challenged contractual provisions (or that, but for NYP's conduct, prices would certainly be lower across the market).[5]

The "direct evidence" path to proving anticompetitive effect is therefore not a slam dunk, even accepting the current allegations in the complaint as true. But even if plaintiffs fall short of clearing the "direct evidence" bar, they have the "market power + indirect evidence" path to fall back on. "[A] plaintiff may demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition." MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 182 (2d Cir. 2016) (quoting Top Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97 (2d Cir. 1998)).

[5] Plaintiffs also allege obliquely that the challenged conduct hinders competition on quality. But again, the barometer for direct evidence is whether the plaintiff can show that quality would be higher without the challenged conduct. Plaintiffs' allegations do not spell this out explicitly.

"Market power is the ability to raise prices above those that would be charged in a competitive market." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109 n.38 (1984). Courts may consider many factors when assessing market power, including, as relevant, "excess or supracompetitive profits," "structural barriers to entry," and "the power to force a purchaser to do something that he would not do in a competitive market." In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d at 97. Plaintiffs have alleged that defendant enjoys supracompetitive profits; the market for inpatient general acute care has high barriers to entry; and defendant is a "must-have" for insurance plans, which allows defendant to impose contractual provisions to which insurers otherwise would not agree.

Defendant complains that plaintiffs have failed to allege market power because they do not allege "substantial or problematic market shares." Plaintiffs allege that defendant's market share is more than 30 percent in Manhattan and more than 25 percent in the Four-Borough Market. To the Court, a 25-30% market share is obviously substantial, particularly in a market with high barriers to entry. Defendant cites one case in which a market share of 39% was found to be insufficient to infer market power, but a key basis for that decision was the lack of barriers to entry in the relevant market. See New York v. Anheuser-Busch, Inc., 811 F. Supp. 848, 873 (E.D.N.Y. 1993) (explaining that "barriers are clearly not a significant factor in New York State beer sales"). The market for inpatient general acute care obviously has high barriers to entry. The complaint cites, for example, the need to build expensive facilities, hire skilled staff, and clear regulatory hurdles.

Regardless of barriers to entry, the bigger issue with defendant's argument is that it seems to suggest that anticompetitive effects "cannot be shown unless the plaintiff … first proves that

[defendant] has a large market share." Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000). But market share "is only a way of estimating market power," id., "not a prerequisite for bringing a [Sherman Act § 1] claim," Todd, 275 F.3d at 206.

All of this, taken together, constitutes sufficient allegations to satisfy plaintiffs' burden of alleging anticompetitive effect. There is thus no basis for dismissal on the issue of market power; plaintiffs have adequately alleged both market power and at least indirect evidence of anticompetitive effect.

ii. Exclusionary Conduct and Rival Foreclosure

Defendant next argues that plaintiffs' claims must be dismissed because they do not allege exclusionary conduct or rival foreclosure. Regarding exclusionary conduct, defendant insists that its contractual provisions are for purposes of "*inclusion*," and "the result is an open network that maximizes patient choice and excludes no one." Regarding rival foreclosure, defendant avers that antitrust laws exist to "prohibit conduct that *excludes* rivals from the market," but NYP "has not foreclosed anyone from anything."

Although preventing competitors from being excluded or foreclosed from the market is one goal of the antitrust laws, it is surely not the only goal. The antitrust laws prohibit anticompetitive conduct, which "comes in many different forms that cannot always be categorized." Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 354 (4th Cir. 2024). Plaintiffs have brought a claim under Section 1 of the Sherman Act, which prohibits contracts "in restraint of trade." 15 U.S.C. § 1. "To prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." Geneva Pharms. Tech. Corp. v.

Barr Lab'ys Inc., 386 F.3d 485, 506 (2d Cir. 2004). Simply put, there is no requirement that plaintiffs plead exclusionary conduct or rival foreclosure to state a Sherman Act § 1 claim.

The Court therefore rejects defendant's attempt to impose such a requirement. Although "substantial foreclosure of the market [and] actual excluded competitors … may be indicia of an actual adverse effect on competition, they are not the only indicia." US Airways, Inc. v. Sabre Holdings Corp., 105 F. Supp. 3d 265, 281 (S.D.N.Y. 2015), aff'd in relevant part, 938 F.3d 43 (2d Cir. 2019). In any event, plaintiffs allege that NYP's competitors are foreclosed from competing with NYP for preferred network status. For example, in a tiered network, no matter what competitors do, their products will be in the same tier as or a lower tier than all of NYP's products because of NYP's all products provision. See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 656 (2d Cir. 2015) ("For there to be an antitrust violation, [competitors] need not be barred 'from all means of distribution' if they are 'bar[red] … from the cost-efficient ones.'" (quoting United States v. Microsoft Corp., 252 F.3d 34, 64 (D.C. Cir. 2001))).

Defendant has therefore failed to persuade the Court that plaintiffs' claims should be dismissed for failure to state a claim, and its motion to dismiss is denied in its entirety.

## III. Motions to Appoint Interim Class Counsel

CCWDC and PCC ask the Court to appoint their counsel as interim class counsel, which includes Fairmark Partners LLP, Susman Godfrey LLP, and Farella Braun + Martel LLP ("Fairmark/Susman/Farella"). UFCW asks the Court to appoint its counsel as interim class counsel instead, which includes DiCello Levitt LLP, Garwin Gerstein & Fisher LLP, and Lieff Cabraser Heimann & Bernstein LLP ("DiCello/Garwin/Lieff").

"When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g) of the Federal Rules of Civil

Procedure." In re Amla Litig., 320 F.R.D. 120, 121 (S.D.N.Y. 2017) (quoting Buonasera v. Honest Co., Inc., 318 F.R.D. 17, 18 (S.D.N.Y. 2016)). These factors include "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). "When more than one choice of counsel satisfies these requirements for adequacy, Rule 23(g)(2) provides that the [C]ourt must appoint the applicant best able to represent the interests of the plaintiffs." In re Warner Music Grp. Data Breach, No. 20-cv-7473, 2021 WL 725728, at *2 (S.D.N.Y. Feb. 22, 2021) (quoting In re Mun. Derivatives Antitrust Litig., 252 F.R.D. 184, 186 (S.D.N.Y. 2008)).

First, the Court notes that both proposed slates are well-qualified, with experience in healthcare antitrust class action cases and skilled attorneys who could ably represent the putative class. Accordingly, the Court's decision is guided by considerations other than the capability and resources of counsel.

Second, with the other Rule 23 factors in mind, the Court concludes that Fairmark/ Susman/Farella should be appointed as interim class counsel. Fairmark/Susman/Farella represents "the plaintiff[] who filed the first of these consolidated actions."[6] See In re GSE Bonds Antitrust Litig., 377 F. Supp. 3d 437, 438 (S.D.N.Y. 2019) (appointing lead counsel in part on this basis). In preparing its complaint, Fairmark/Susman/Farella conducted substantial investigative work and invested significant resources. They began investigating NYP's contracting in 2022, three years before the first complaint was filed. Additionally, they have

[6] DiCello/Garwin/Lieff argue they should be appointed as lead because they represent the largest plaintiff, but the Court views the timing of the suits, rather than the size of the plaintiffs, as more indicative of the work required in this type of case.

been developing the liability and damages theories since 2023. Thus, Fairmark/Susman/Farella's "work ... in identifying or investigating potential claims in the action," Fed. R. Civ. P. 23(g)(1)(A)(i), weighs in favor of their appointment.

Defendant urges the Court to receive and evaluate competing proposals for "attorney's fees and nontaxable costs" prior to ruling on the appointment of interim class counsel. This is premature; attorney's fees and nontaxable costs are determined at the end of the case. See Fed. R. Civ. P. 23(h) (attorney's fees are generally determined after counsel's performance and the results achieved can be evaluated). Defendant cites Moore v. Rubin, 766 F. Supp. 3d 423 (E.D.N.Y. 2025), to argue that disclosure of rates is necessary. But the Court's analysis in that case, which the Court undertook after seven years of litigation and a trial, proves that defendant's concerns are premature. In other words, the Court will evaluate the reasonableness of the rates if it is called upon to award attorney's fees later in the case, regardless of who is appointed as interim class counsel.

## CONCLUSION

For the reasons stated above, NYP's motion to dismiss [43] is denied; UFCW's motion to appoint interim co-lead class counsel [44] is denied; and CCWDC and PCC's motion to appoint interim co-lead class counsel [45] is granted.

**SO ORDERED.**

Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
October 1, 2026